MONTGOMERY WARD & COMPANY, INC. ET AL.
*v.* ALPHONSE KEULEMANS

[No. 52, September Term, 1974.]

*Decided October 16, 1974.*

The cause was argued before THOMPSON, GILBERT and MENCHINE, JJ.

*Kevin J. McCarthy*, with whom were *Willard G. Hoeltzel* and *Sasscer, Clagett, Channing & Bucher* on the brief, for appellants-cross-appellees.

*James J. Casey* for appellee-cross-appellant.

MENCHINE, J., delivered the opinion of the Court.

This is an appeal by Montgomery Ward & Company, Inc. (Montgomery Ward), Carleton R. Johnson (Johnson) and Allen Gilgenberg (Gilgenberg) from judgments entered in the Circuit Court for St. Mary's County in favor of Alphonse Keulemans (Keulemans) after jury verdicts [1] for $1,350.00 and $25,000.00.

Keulemans claimed compensatory and punitive damages from Montgomery Ward, Johnson, Gilgenberg and another [2] in a four count amended declaration alleging (1) false arrest, (2) false imprisonment, (3) malicious prosecution, and (4) defamation.[3]

Before reaching the substantive issues raised after the actual trial of this case in the lower court, it is necessary to pass upon a motion by the appellants to restrict the scope of that trial.

### Motion to Restrict Scope of Trial

The judgments in the subject appeal were entered in the second trial of the cause. Verdicts in favor of Keulemans against the appellants in an earlier trial had been set aside on motion for new trial.

1. An earlier appeal was dismissed as prematurely taken, the record reflecting the absence of a final judgment. See *Montgomery Ward & Co., Inc. v. Keulemans*, No. 517, September Term, 1973, per curiam, January 21, 1974.

2. A fourth defendant, Charles Davis, is not a party to this appeal, the action having been dismissed as to him in the trial court, without appeal.

3. The trial court granted defendants' motion for directed verdict on the defamation count. No appeal was taken from that determination.

At the earlier trial, the jury rendered general verdicts for the plaintiff of $25,000.00 for compensatory damages and of $15,000.00 for punitive damages against all defendants. Before that verdict was recorded, however, counsel for the defendants declared: "If the Court please, I would like that broken down into four counts."

The trial judge thereupon addressed the jury as follows:

"Ladies and gentlemen of the jury, Mr. Foreman, we ask you to return to the jury room and break down your verdict as to the four counts of false arrest, false imprisonment, malicious prosecution and defamation of character and also against which defendants you assess or find against. There are four defendants in the case; Montgomery Ward, Carleton Johnson, Allen Gilgenberg and Charles Davis. So you may return and reconsider your verdict."

At that point counsel for the defendants seems to have had a change of heart, saying, "I would move for a mistrial at this point, your Honor. I think the verdict is improper and I do not think the jury can remedy it." The court overruled the motion.

After further deliberation, the jury returned to the courtroom and rendered the following verdicts:

"For punitive we find $15,000.00 against Montgomery Ward;

\* \* \*

Under false arrest for compensatory $6,000.00 against Mr. Johnson;

False imprisonment $6,000.00 against Mr. Johnson; Malicious prosecution, compensatory, $6,000.00 against Montgomery Ward; and defamation, compensatory, $7,000.00 against Montgomery Ward, Mr. Johnson and Mr. Gilgenberg."

The verdicts of the jury were then recorded.

It should be noted that the aggregate of the verdicts as

amended or corrected by the jury totaled $40,000.00 (as did the aborted general verdicts for $25,000.00 and $15,000.00). It should be noted also that at least one verdict was rendered against each of the present appellants.

A motion, *unconditional in terms,* for judgment N.O.V. and/or for a new trial was filed in behalf of *all* defendants. After hearing, the following order was passed by that trial judge:

> "Upon consideration of the Motion of Judgment NOV and/or New Trial, it is by the Circuit Court for St. Mary's County, Maryland, this 28th day of March, 1973,
>
> "ORDERED, that the defendants are granted a new trial in the case unless the plaintiff files a remittitur of $29,000.00 within ten days from the signing of this order.
>
> "Said Remittitur represents a reduction of $19,000.00 on the compensatory damages and $10,000.00 on the punitive damages bringing the total damages assessed to $11,000.00 instead of the original $40,000.00 verdict."

The plaintiff having declined to file the remittitur, the cause was brought to trial a second time. Before commencement of the second trial a motion was made by the appellants to restrict the scope of the new trial. The trial judge, properly we think, denied the motion.

The appellants urge that the new trial granted by the first trial judge was only partial in character. They argue that the verdicts rendered by the first trial jury operated with finality to discharge Montgomery Ward and Gilgenberg from all liability under the false arrest and false imprisonment counts and to discharge Montgomery Ward from all liability under the malicious prosecution count. Careful scrutiny demonstrates that the argument is ingenious but unsound.

It is true that the verdicts were in varied amounts and some were rendered as to less than all defendants and were attributed to specific counts of the declaration. Nonetheless,

the motion for a new trial or for judgment N.O.V. was couched in general terms and relief from the verdicts was sought by all defendants. The motion did not make reference to a particular verdict or a particular defendant, or to any separate count of the declaration. The overturn of every verdict was sought. Each verdict was affected by the court's conditional grant of a new trial. We hold that in such circumstances every verdict became a nullity when the plaintiff declined to file a remittitur. We point out that the remittitur required of the plaintiff was declared in a single sum of $29,000.00. This fact also tends to show an intent and purpose by the trial judge to grant a new trial as to all defendants under all counts absent the filing of a remittitur in that amount.

Maryland Rule 567 c. reads as follows:

"c. *Partial—Severable Matter.*

Where it appears to the court upon a motion for a new trial that any grounds for a new trial affect only a severable part of the matters in controversy, or only some or one of the parties, the court may grant a new trial as to such part, or as to such party and either enter final judgment as to the remaining parts or parties, or stay the entry of final judgment until after the new trial."

While this rule plainly permits a trial judge to grant a partial new trial, we conclude that in the subject case the general character of the motion for new trial and/or for judgment N.O.V. and the all-inclusive words used by the trial court in the order passed pursuant to that motion, combine to show that the grant of a new trial was absolute and not partial in effect. *Cf. Cavey v. Srnec,* 256 Md. 483, 488, 260 A. 2d 292, 294-95. The second trial properly was permitted to proceed against all of the subject appellants.

Appellants next attack the judgments upon the grounds:

(a) That there was probable cause, as a matter of law, for the arrest and prosecution and thus

the motion for a directed verdict as to all defendants should have been granted;

(b) That there was no evidence legally sufficient to support an action against Gilgenberg; and

(c) That the verdict and judgment for punitive damages should have been stricken on motion for judgment N.O.V. because no compensatory damages had been found in the malicious prosecution action.

### Probable Cause

The threshold question of what facts are sufficient to show probable cause is one of law for the court; but whether such facts are proved is for the jury. *Banks v. Montgomery Ward & Co.*, 212 Md. 31, 42, 128 A. 2d 600, 606. In *Banks* it was said at page 39 [604]:

"* * *Probable cause is a reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing that the accused is guilty. Mere belief, however sincere, is not sufficient. There must be such grounds of belief founded upon actual knowledge of facts as would influence the mind of a reasonable person." (Interior citations omitted.)

See also *Brewer v. Mele*, 267 Md. 437, 447, 298 A. 2d 156, 163.

The rules of law controlling the determination of the question were clearly and succinctly declared in *Durante v. Braun*, 263 Md. 685, 284 A. 2d 241, wherein it was said at page 688-89 [243]:

"In deciding this question [existence of probable cause] we must keep in mind that although sound public policy affords protection to persons who in good faith and on reasonable grounds cause prosecution of another (*Stansbury v. Luttrell*, 152 Md. 553, 565, 137 A. 339 (1927)), nonetheless, the rule of law prevails, that where the court directs a verdict in favor of one of the parties, we must

assume the truth of all credible evidence in the case tending to sustain the contentions of the party against whom the verdict is directed as well as all inferences of fact reasonably and fairly deducible therefrom. *Trionfo v. R. J. Hellman, Inc.*, 250 Md. 12, 15, 241 A. 2d 554 (1968); *Smack v. Whitt*, 249 Md. 532, 536, 240 A. 2d 612 (1968).

"The trial judge correctly stated the respective roles of court and jury with relation to the issue of 'probable cause' in a malicious prosecution action, paraphrasing what we said in *W. T. Grant Co. v. Guercio*, 249 Md. 181, 187, 238 A. 2d 855 (1968), to the effect that:

'If the facts or inferences drawable from the "probable cause" that motivated a criminal charge are clear and undisputed, the question is one of law for the court, but if such facts or inferences are disputed, it is a question of fact for the jury. [Citation of cases omitted].' 249 Md. at 187."

The record would support the following facts:

Alphonse Keulemans, a native of Brussels, Belgium, was a naturalized citizen of the United States. Upon arrival in the United States he gained employment with the Giant Food Stores and remained in their employ for ten years. While so employed, the former operating manager of Montgomery Ward sought out Keulemans and asked him to become receiving stock and shipping manager at Montgomery Ward's store in the Capital Plaza Shopping Center, Hyattsville, Maryland. He accepted. For eight years, up to the day of the events giving rise to the subject action, Keulemans pursued that employment.

A position of some responsibility, Keulemans was supervisor of twenty-six employees in his department, receiving merchandise on the dock; handling freight bills; shipping merchandise for delivery; getting merchandise to the marking room. Keulemans' personal duties included spending about an hour a day on the store floors checking

merchandise on the shelves to see that it was priced and coded correctly. In that part of his job he was required from time to time to pick up merchandise for examination, and, if necessary, for correction of improper marking. Such was Keulemans' status on June 22, 1971. Carleton R. Johnson, a member of Montgomery Ward's security force, had been employed at the store for about one year before the incident. He knew the status of Keulemans at the store.

The arrest, with the ensuing prosecution, was precipitated by events occurring in the store on the afternoon of June 22, 1971. The versions of those events by Keulemans and by Johnson are materially different.

Keulemans thus described his actions:

"Q Did there come a time during that day when you went to the counter in Montgomery Ward where sunglasses were sold?

A Yes, I found out in the receiving area upstairs that we had two racks of polaroid glasses that came in, and naturally we cannot touch them upstairs because that was against the' regulations in the company.

Nobody can buy anything or pick something and put it on the side to be bought later. So I said, well as soon as I have a break I'll go down on the floor and take a look and see what kind of glasses they have. The pair over People's Drug Store didn't fit right because that was the only thing available at that time. So I went down on the floor around 4:00 o'clock in the afternoon and went to the racks and picked up one or two pair of glasses and matched them up with my sunglasses that I had already to see that I could find the pair that would fit better my regular glasses, and while I was doing this they paged me and called me on the intercom.

So I put the glasses that I had in my hand, I was trying to match up, back on the shelf, put mine in my pocket and went to the phone and

answered my page, and they wanted me to do something right away. So I forgot about the whole thing. I just kept on doing my work.

Q   Well, this display of sunglasses, did they have any of the clip-on type that you were looking for?

A   Yes, but they were all the way down on the bottom. That is the way the rack comes, the regular, all polaroid glasses are hanging on top, full glasses, and the clip-on, all the way down on the bottom.

Q   How far from the floor are the clip-ons, were the clip-ons on that day?

A   The clip-ons were right on the bottom of the shelf. That is no higher than this. So I had to stoop down to look at it.

Q   I show you these clip-on sunglasses and ask you to identify them.

A   Yes, this is the pair that I bought over People's Drug Store.

Q   When you were looking at the glasses at Montgomery Ward were you trying them on?

A   On my face, you mean?

Q   On your glasses?

A   No; I didn't try them on these glasses. I tried them with my glasses.

Q   But you were trying them on?

A   I was not trying them on my face. I was just matching them up, you know, like this, and putting them over the pair I had already to see what — if they were bigger or smaller.

Q   Did you find any bigger?

A   Well, I didn't look long enough because I got paged on the intercom, you see, and I thought this was more important than to fool around with this.

* * *

Q   If you didn't have them in your hand where did you have them?

A   I was down on my knees, bent down, and I had my pair in my hand and I took a couple pairs off the shelf and compared them with mine and then every time I found one that didn't fit I put it back on the shelf, and I took another one and fitted it.

\* \* \*

Q   What do you mean you tried two pair?

A   I just took 2 pair, [off the rack] one at a time \* \* \* I compared them and put them back."

Johnson had arrested Keulemans solely on the basis of observations that he thus detailed:

"Q   Where did you first observe him?

A   I observed Mr. Keulesman down in front of the glass case, sunglass case.

Q   Where were you at that — at that time?

A   I was walking down the main aisle.

Q   What did you see Mr. Keulesman do when he was stooping down?

A   I seen Mr. Keulesman reach out and pick up three pairs or two pairs of clip-on glasses. He had three pairs in his hand, and he was reaching to get more glasses.

Q   Then what did you see Mr. Keulesman do?

A   He looked at the glasses and about that time he got a page. Mr. Keulemans got a page, and then they gave him a phone number to call. At that time he put two pair of glasses back. He palmed the third pair and instead of using the ·phone right directly behind him, he moved around the counter, used the phone approximately fifty feet away. And at that time he got behind the pole, got on the phone, slipped the glasses in his pocket.

Q    Can you described these three glasses to me?
     Were they all similar?

A    Yes, sir.

Q    Was there anything differentiating one pair
     from another? Did they all look the same?

A    The same. Yes, sir."

Johnson testified that he kept Keulemans under surveillance until the latter left the store and entered his automobile at about 6:30 p.m. Again there are two versions of what then occurred.

The Keulemans version:

"Well, I worked until about 6:30 that day when I left the store I walked out to the parking lot and got in my car, started the car, and I was ready to go home when I saw Mr. Johnson running out the garage of the store.

So when I saw him running out the garage I said it looks like he's running after a shoplifter, because I did help Mr. Johnson sometimes on security purposes. So I got — I stopped the motor of the car, got out of my car and walked to him and asked him, 'Can I help you?' He said, 'No.' He said, 'You can't help me.' He said, 'But I like to talk to you.' I said, 'Well,' I said, 'is it that important to talk to me now?' I said, 'because I am ready to go home.' He said, 'Yes; it is important. I like to talk to you in my office.' I said, 'Okay.'

So I walked with him to his office and when we get in his office he looked at me with a smile on his face, and he said, 'I finally got you, did I?' I said, 'What do you mean, you got me?' He said, 'Yes, I saw you taking a pair of clip-on sunglasses off the shelf this afternoon.' I said, 'I didn't take any clip-on sunglasses off the shelf.' I said, — and I went in my pocket then, you see, and I showed him the glasses. I said, 'You mean those?' He said, 'Yes. You took them off the shelf this afternoon.' I said,

'You're wrong.' I said, 'I bought them from People's Drug Store.' I said, 'And I can prove that.' So he said, —

Q   What if anything happened then?

A   Well, then he told me I was under arrest. So when — as soon as I was under arrest I said, 'Well, —' I said, 'I better talk to the store manager or my operating manager, but none of the two were there. They were already gone. And then I said, — I asked him if I could talk to Mr. Gilgenberg.

Q   Who is he?

A   He is in charge of all security in the District for Montgomery Ward.

Q   Did you talk to him?

A   I talk to Mr. Gildenberg.

Q   How did you talk to him?

A   I told him what happened to me. I said to him, 'What are you trying to do to me?' after I explained to him what happened. So the answer he gave me, he said, 'Well, we got laws into this country and if you didn't take it,' he said, 'you don't have anything to worry about.' He said, 'In the meantime,' he said, 'I got to go by what Mr. Johnson told me.' "

The Johnson version:

"Q   Did there subsequently come a time when you talked to Mr. Gilgenberg — excuse me — Mr. Keulemans after he had left the store?

A   Yes, sir. To be sure to make — see if he was going to pay for the glasses or not. This occurred about four-thirty, quarter-to-five. We followed him around the store until he left. He left the store, was going to his car, and as he got to his car I stopped him and asked him would he come to the office.

Q   Did he subsequently go to the office?

A   Yes; he did.

Q   When he came to the office did he tell you where he allegedly purchased the glasses?

A   Well, I asked him about the glasses, at first. And then he got all flustered, and all, and said, 'I bought them at People's.' "

After Keulemans had been arrested, but before he had been compelled to surrender himself to police, Johnson and Keulemans' attorney talked with the manager of the Peoples Drug Store. The manager told them that the drug store "didn't carry these glasses any more." It does not appear that the manager was asked whether the drug store carried the glasses at the time Keulemans claimed he had purchased them. Two days after his arrest Keulemans contacted Mrs. Helen Temple at the Peoples Drug Store. Mrs. Temple recalled the purchase vividly. In the course of her testimony she said:

"Q   How long had you been employed at People's Drug Store?

A   Well, this July would be ten years, and I was there nine years and eight months. From 1963.

Q   At the same store, Capital Plaza?

A   Same store, same place.

\* \* \*

Q   Directing your attention to the month of March of 1971, at that time were you selling this type of clip-on sun glasses?

A   I was. I was.

\* \* \*

By Mr Casey:

Q   Mrs. Temple. I show you Plaintiff's Exhibit No. 2 [Envelope for film bearing the date 3/12/71

and Keulemans' name.] and ask you if you can identify that?

A  Yes; I can. I can identify it as People's — this isn't my writing. I didn't take this work in. But I delivered this film.

Q  Do you remember who you delivered it to?

A  Yes; I do. I delivered it to Mr. Keulemans.

Q  At any time — at the time you delivered this film to Mr. Keulemans was there any other purchase made?

A  A pair of sun glasses, the style that you have right there in your hand.

Q  Is there any serial numbers or anything else on this?

A  No. I mean to order I order by numbers which would describe the style, but no serial numbers.

Q  Each individual glass can't be identified?

A  When I ordered them there were six in a box, and I ordered them, I had a picture to go by by the style, and when I wanted that style I had an order number; I filled in the order number which would replace that style.

Q  Now, do you recall when you made this sale of glasses to Mr. Keulemans?

A  Well, it would be around in the month of March right after our new racks came in. They came in usually around February or first of March.

Q  Did you know Mr. Keulemans personally?

A  Not personally. No; I didn't."

Two of Keulemans' fellow employees testified that they had seen him wearing clip-on glasses when he arrived at work on the morning of his arrest. Keulemans was found not guilty of shoplifting on July 26, 1971.

The issue here essentially involves a determination of the question whether the facts and circumstances were such as

to require the private prosecutor to make further investigation before effecting the arrest and initiating the criminal proceedings.

The Restatement of Torts, § 662, at 403-04 (1938) states the rule determining the existence of probable cause, and comments upon a duty to investigate as follows:

"TOPIC 3. PROBABLE CAUSE

§ 662. EXISTENCE OF PROBABLE CAUSE.

One who initiates criminal proceedings against another has probable cause for so doing if he

(a) reasonably believes that the person accused has acted or failed to act in a particular manner, and

(b)

(i) correctly believes that such acts or omissions constitute at common law or under an existing statute the offense charged against the accused, or

(ii) mistakenly so believes in reliance on the advice of counsel under the conditions stated in § 666."

Commenting on clause (a) it is said (at 405-06):

"*Comment on Clause* (a):

e. *Mistake of fact — Circumstances known to private prosecutor.* It is the facts known or reasonably believed by the private prosecutor which determine the existence or non-existence of probable cause and not the facts which, although within the knowledge of third persons, are not communicated to him. If, in the light of the facts as he knows or reasonably believes them to be, *a reasonable man would believe that the conduct of the accused was such as to make him guilty of the offense charged against him, the existence of exonerating facts is immaterial unless such facts would have been disclosed by such an investigation*

*as the prosecutor should have made before initiating the proceedings*, as to which see Comment *i*." (Emphasis added.)

In Comment *i* of the Restatement the factors to be considered in determining whether investigation should be undertaken are set out (at 408-09):

"*i. Mistake of fact—Necessity for investigation.*
Circumstances known or believed by the accuser may be incriminating to the accused and yet may not so clearly indicate guilt that a reasonable man would initiate criminal proceedings without investigation. In determining whether an investigation should be made, the following factors are important; the necessity of prompt action to prevent escape; the availability of information other than that in the possession of the accuser; the existence of a ready opportunity to obtain an explanation from the person accused or to ascertain his reputation; the character of the source from which the accuser's information comes. The accuser may properly be required to make inquiry as to the veracity of his informants where his belief is founded upon their information. He may even be required to distrust the accuracy of his own observations when they are made under such circumstances that they may be suspected of inaccuracy. In all these cases the fact that an investigation might prove dangerous, or the probability that it would be futile, are matters to be taken into account."

The import of the Restatement rule and comments is that a failure by a private prosecutor to pursue a course of further investigation may bear heavily upon the question whether probable cause exists, if the circumstances are such that a reasonable man would have pursued such a course.[4]

---

4. Prosser, Law of Torts, Ch. 22, § 119, at 842 (4th Ed. HB, 1971) states that, "* * * where a reasonable man would investigate further before beginning the prosecution, he may be liable for failure to do so."

While we have been referred to no Maryland case, and we have found none, that directly related to the effect of a failure to investigate upon a determination of the existence of probable cause, some Maryland cases imply that it may be a factor of importance. See *Johns v. Marsh*, 52 Md. 323, 337; *W. T. Grant Co. v. Guercio*, 249 Md. 181, 183-84, 238 A. 2d 855, 856-57.

In *Brewer v. Mele, supra*, although holding that probable cause had been shown as a matter of law, the Court of Appeals discussed the question, saying at pages 449-50 [164]:

> "He raises the questions, at what stage the existence of a 'satisfactory explanation' must be sought out and by whom? Our own prior decisions in *Dorsey v. Winters*, 143 Md. 399, 122 A. 257 (1923) and *Lasky v. Smith*, 115 Md. 370, 80 A. 1010 (1911), are not particularly helpful, both dealing with situations where explanations (in the former case, bad; in the latter case, good) were actually thrust upon private prosecutors in advance of the initiation of proceedings. *Having the explanation, they could not with impunity ignore it.* Not addressing themselves to the question whether the prosecutor must seek the explanation, these cases simply speak of the inference having force in the absence of a reasonable explanation.
>
> "As to the extent of the initial responsibility, at least so far as a law enforcement officer is concerned, we agree with the reasoning of *Knapp v. Chicago, B. & Q. R. Co.*, 113 Iowa 532, 85 N. W. 769 (1901), where it was held:
>
>> 'True, an explanation is admissible, but the prosecutor is not bound to seek it *unless the circumstances are such as to call for an investigation.'* 85 N. W. 770.
>
> Once the investigating policeman has crossed the threshold of probable cause, we will not place upon him the additional burden of seeking out and negating possible explanations of possession, lest

he press charges at his own peril." (Emphasis added).

An excellent exposition of the rationale when and why a failure to investigate may destroy probable cause is found in *Scott v. Dennett Surpassing Coffee Co.*, 64 N.Y.S. 1016 (S.Ct. App. Div., 2d Dept., 1900) at 1017-18:

"Probable cause, unlike malice, is not determined by standard of the particular defendant, but of the ordinarily prudent and cautious man exercising conscience, impartiality, and reason without prejudice upon the facts. Heyne v. Blair, 62 N. Y. 19, and cases cited. And so mere honest belief in guilt is not enough; it must be founded upon reasonable grounds. Farnam v. Feeley, 56 N. Y. 451; Fagnan v. Knox, 66 N. Y. 525. For though he have belief, and yet act negligently and irrationally, the prosecutor may not have probable cause. The test, then, is not exclusively limited to the actual knowledge in fact of the defendant, but may be put to any knowledge which he could or ought to have gained in the exercise of ordinary prudence and caution; and if, by such exercise, a proper investigation might have cleared away suspicious circumstances, and yet was omitted, there may be evidence of no probable cause. Add. Tort, 221; Sweet v. Smith, 42 App. Div. 502, 509, 59 N. Y. Supp. 404; Farnam v. Feeley, supra; Grinnell v. Stewart, 32 Barb. 544; 2 Greenl. Ev. 452; Barron v. Mason, 31 Vt. 189; Abrath v. Railway Co., 11 Q. B. Div. 440, 442, 450; Tabert v. Cooley, 46 Minn. 366, 49 N. W. 124, 13 L. R. A. 463. Were the rule otherwise, the omission of ordinary care and prudence would equal the exercise thereof, and rashness would rank with caution; and then, too, the question would not turn on the belief of the ordinarily prudent and cautious man, as the law is, but upon the belief of a defendant who might have been imprudent and incautious."

Other out of state cases of similar import are: *LaFont v. Richardson*, 119 S.W.2d 25, 29 (Springfield Ct. of App., Mo., 1938); *Eastman v. Leiser*, 181 N. W. 109, 112 (S. Ct., Minn. 1921).

In the subject case, the evidence viewed in the light most favorable to Keulemans, would permit the trier of facts to reach the following conclusions:

1. That the private prosecutor received a spontaneous explanation entirely exculpatory to the accused at the very moment of confrontation, *before* the arrest was effected or the criminal proceedings initiated;

2. That such explanation was readily and easily susceptible to investigation *before* an arrest was made or the criminal proceedings initiated;

3. That the known background of the accused would militate against the likelihood of his commission of such an offense;

4. That such investigation, if made, would have persuaded a prudent and cautious man that the exculpatory information probably was true; and

5. That there were no countervailing circumstances motivating against investigation, such as personal danger to the prosecutor or a likelihood that one guilty of a crime might thereby escape justice.

We conclude, accordingly, that under these facts and circumstances the question whether there was probable cause for the arrest and for the ensuing prosecution was for the jury.

### *Legal Sufficiency of the Evidence as to Gilgenberg*

What we have said with respect to probable cause as to Johnson applies with equal force to the appellant Gilgenberg. Gilgenberg was Johnson's superior. It was to Gilgenberg that Keulemans turned before arrest. Gilgenberg fully sustained Johnson's decision to arrest and to initiate

criminal proceedings against Keulemans. Gilgenberg was possessed of the same basis of knowledge of the facts and circumstances then existing as was Johnson. Thus, he and Johnson are equally responsible. *Banks v. Montgomery Ward & Co., supra,* at 38 [603].

## The Verdict for Punitive Damages

Appellants seek to isolate the jury's determination that appellee was entitled to punitive damages in the amount of $25,000.00 and by virtue of such isolation to contend that there was no finding of the compensatory damages essential to support a grant of punitive damages.

The case had been submitted to the jury on ten issues. On issues 1 and 3 the jury found Johnson and Gilgenberg, respectively, guilty of false arrest; on issues 2 and 4 the jury found that Johnson and Gilgenberg, respectively, were employees of Montgomery Ward acting within the scope of their employment. On issues 6 and 8 the jury found Johnson and Gilgenberg, respectively, guilty of malicious prosecution; on issues 7 and 9 the jury found Johnson and Gilgenberg, respectively, were employees of Montgomery Ward acting within the scope of their employment.

The necessary effect of the jury's answers to issues 1, 2, 3, 4, 6, 7, 8 and 9 was that a cause of action for false arrest and malicious prosecution had been shown by the evidence against all appellants. No other conclusion is permissible.

Appellants argue, however, that the manner in which the jury responded to issues 5 and 10 demonstrates that the verdict fixing punitive damages is not supportable in law. Issues 5 and 10 (with the jury's answers shown) were as follows:

"5. If your answer to question 1 or 3 is Yes, what damages do you assess?

Compensatory $1350.00
Punitive _____

10. If your answer to question 6 or 8 is Yes, what damages do you assess?

Compensatory _____
Punitive        $25,000.00."

In a "Motion for judgment N.O.V. and remittitur," the defendants (appellants here), alleging: "There was no award of at least nominal compensatory damages to justify or to serve as a basis for the jury award of $25,000.00 punitive damages," prayed that judgment N.O.V. as to the "verdict of $25,000.00 punitive damages" be granted or, in the alternative, that $25,000.00 of the total verdict be remitted.

In the course of his opinion denying the motion, the trial judge stated:

> "In the present case, there is no doubt but that the Plaintiff proved actual loss as a result of the Defendants' prosecution of the criminal action (which became the basis for malicious prosecution count, covered by Special Issues 6-10). There is unrebutted evidence that the Plaintiff expended Three Hundred Fifty Dollars ($350.00) in defense of the criminal charges.

> "It cannot be argued that this cost was a result of the tort of false arrest. That the jury included the legal fees in the compensatory award for false arrest is insufficient to take the punitive award away for failure to prove actual damage under malicious prosecution.

> "In Poe, *Pleading and Practice* (4th Edition Vol. I, Section 758), it is said that 'in order to destroy the validity of a verdict, the defect must be a substantial one'. It also says that 'the court shall work the verdict into form, and make it serve'. This Court will implement this doctrine to effectuate the intention of the jury in the present case, and not upset the verdict for the technical defect put forth by the Defendants. It is clear to the Court that the jury intended to award at least Three Hundred Fifty Dollars ($350.00) to compensate the Plaintiff for the pecuniary loss due to the malicious prosecution, and to award Twenty-five Thousand Dollars ($25,000.00) as punishment to the Defendants and to set an example to others similarly situated.

"The Court finds that the Defendants' Motion for Judgment Non Obstante Verdicto [sic] should not be granted for the reasons stated above."

It is appropriate here to note that proof of two, and only two, items of special compensatory damages was attempted, i.e. (a) the loss of five weeks income between the date of arrest and the date of acquittal, at $200.00 per week or $1,000.00, and (b) the $350.00 fee of counsel who represented Keulemans in the trial at which he was acquitted.

Whether or not the item of lost income may be attributable to the false arrest or to the malicious prosecution claim, or both, it is crystal clear that the damages represented by the $350.00 counsel fee are attributable to the malicious prosecution claim.

The appellants rely upon *Shell Oil Co. v. Parker*, 265 Md. 631, 291 A. 2d 64. We find their reliance misplaced. In *Shell*, Judge Barnes, speaking for the Court of Appeals, pointed out at 646 [72] that the jury was instructed [at the plaintiff's own request]:

"* * * to consider *only* nominal damages as defined in the charge as one cent to one dollar for a violation of *a technical right* of the Parkers, and is awarded to a plaintiff ' whose legal rights have been *technically* violated but who has proved *no real damages.*' (Emphasis supplied.) We must conclude, therefore, that 'the nominal one dollar' awarded by the jury was awarded in accordance with the trial court's instructions and was for a technical violation of the Parkers' legal rights, and was not for compensatory damages the amount of which was not proved by the Parkers."

In the subject case, however, the trial judge in his opinion declared in substance, that the totality of the jury's answers to the issues compelled the conclusion that compensatory damages sufficient to support an award of punitive damages actually had been found by the jury. That conclusion is fully supported by uncontradicted evidence that actual pecuniary

loss was sustained by Keulemans solely as the result of the malicious prosecution.

The trial court properly authorized extension of the punitive damage judgment under the circumstances. His right and power to do so was anciently established. In *Browne v. Browne*, 22 Md. 103, it was said at 115:

> "We now proceed to consider the question of the sufficiency of the verdict in form. This is a material inquiry, because, if the verdict be insufficient in law, indefinite, vague or uncertain, as alleged by the appellant, no judgment could be rendered thereon by the Orphans' Court, and a new trial would be necessary. A verdict must finally determine the issues, and be decisive between the parties. Lord Mansfield said in *Hawks v. Crofton*, 2 Burrows, 699: 'Where the intention of the jury is manifest and beyond doubt, the court will set right matters of form.' And in the same case, Justice Denison said, citing Hob. 54: 'Though the verdict may not conclude formally or punctually to the words of the issue; yet if the point in issue can be concluded out of the finding, the court shall work the verdict into form and make it serve.' Construed by this rule, we are of opinion, that the verdict in this case is sufficient. Looking at the issues submitted to the jury, it is absolutely certain the jury could not have found as they did, without deciding every issue in favor of the defendants. In *Hawks v. Crofton, supra,* Mr. Justice Foster makes this the test of the sufficiency of the verdict. Here the verdict is to the same effect as if the jury had said they found for the defendants on all the issues, which has always been held sufficient."

Another case illustrating the principle is *Davis v. Board of Education,* 168 Md. 74, 176 A. 878. There, a jury had rendered a "verdict finding for the defendant damages assessed at (one cent)" in a condemnation case. The verdict failed to state the jury's finding on the right of the plaintiff

to condemn. The trial judge ordered entry of judgment for the right to condemn on the basis that the jury's verdict *implied* that such right had been found by it. The action of the trial court was sustained, the Court saying at 78-79 [880]:

"What does the verdict here mean and what does it imply? If there had been an unqualified verdict for the defendant, under the terms of section 11 of article 33A, it would have been a denial of the petitioner's right to condemn, but a verdict for the defendant with an assessment of damages means that the petitioner had the right to condemn, and, by reference 'to the pleadings and issues,' as Judge Miller said, the court could mold the verdict into proper shape. As said by Lord Mansfield in *Hawks v. Crofton*, 2 Burrows, 699, 'where the intention of the jury is manifest and beyond doubt, the court will set right matters of form,' and by Justice Denison, in the same case, 'Though the verdict may not conclude formally or punctually to the words of the issue, yet if the point in issue can be concluded out of the finding, the court should work the verdict into form and make it serve'—both quotations taken from *Browne v. Browne*, 22 Md. 103, 115; *Diamond State Co. v. Blake*, 105 Md. 570, 575, 66 A. 631. See *Mitchell v. Smith*, 4 Md. 403; 22 *Enc. Pl. & Pr.* 962."

Because the verdict of the jury itself furnished the compensatory damage cornerstone upon which its verdict for punitive damages rested, we expressly do not pass upon the question whether *proof* of pleaded compensatory damages standing alone, would support a verdict for punitive damages. Judge Barnes had made reference to a line of cases sustaining such view in *Shell v. Parker, supra*, at 641 [70].

> *Judgments affirmed.*
> *Costs to be paid by appellants.*