547 A.2d 1069

**K–MART CORPORATION, et al.**

**v.**

**Sheryl LeVee SALMON.**

**No. 1647, Sept. Term, 1987.**

Court of Special Appeals of Maryland.

Sept. 30, 1988.

Daniel J. Moore (Gary M. Burt and Semmes, Bowen & Semmes, on the brief), Towson, for appellants.

Barbara Matthews (Richard Butchok, on the brief), Baltimore, for appellee.

Argued before GILBERT, C.J., and GARRITY and ROSALYN B. BELL, JJ.

ROSALYN B. BELL, Judge.

The K-Mart Corporation appeals a final judgment entered on a jury verdict in favor of Sheryl LeVee Salmon, appellee. On October 14, 1987, a Baltimore County Circuit Court jury awarded Salmon $28,000 on her malicious prosecution claim against K-Mart and Christopher Canoles, a

K–Mart employee, and $37,000 on her false imprisonment claim against K–Mart and Sharon Witkowski, also a K–Mart employee. The jury also awarded Salmon $100,000 in punitive damages against K–Mart, as well as $1,000 punitive damages each against Canoles and Witkowski. Salmon filed a cross-appeal. The issues on appeal are:

—Whether the trial court erred in finding that, as a matter of law, K–Mart and its employee Canoles acted without probable cause in bringing criminal charges against Salmon.

—Whether the issue of malice on the part of Canoles and, hence K–Mart, was properly preserved for appellate review.

—Whether the trial court erred in submitting Salmon's claim of false imprisonment to the jury.

We affirm the trial court and uphold the final judgments entered on the jury verdicts. We also affirm the trial court in respect to the judgments which are the subject of the cross-appeal and address those issues separately, *infra.*

Sheryl LeVee Salmon discovered that she had lost her purse containing her house keys, wallet, credit cards, checkbook, and a K–Mart check cashing courtesy card on June 7, 1985, a Friday afternoon. That evening, Salmon took the following preventive measures: she notified all the companies with whom she held credit cards, and advised her landlord to change her locks. She also called the 24–hour number on her Easy Bank Card,[1] telling the Easy Bank personnel that she had a checking account. She was told that her checking account could not be closed via telephone, but that she must do it in person Monday morning. That Monday morning, June 10, Salmon appeared at her bank in order to close the checking account. The bank transferred funds to a new account, leaving enough in the old account to cover any outstanding checks. Salmon did not report her K–Mart check cashing courtesy card lost or stolen because

---

**1.** The Easy Bank Card enables a user to have 24–hour access to its money machines.

she believed, based on past experience, that K–Mart did not accept checks without first verifying identification.

On June 7, a Friday evening, the same day Salmon lost her purse, an unkempt woman accompanied by two young children entered the K–Mart store on North Point Boulevard in Baltimore. The assistant manager at the store, John Pussler, asked another employee, Kevin Hagan, to watch the woman who he thought to be a potential shoplifter. This woman asked Hagan if she could use a check to purchase an expensive stereo. Hagan replied that she would first have to have her check approved. Hagan later saw that the woman had purchased the stereo, and he loaded it into her car. He noticed that her car had out-of-state plates, and that the young children who had previously been with the woman were missing. Hagan wrote down the car's tag number and gave the information to Pussler because Hagan was concerned that perhaps the check had not been approved. Pussler asked Hagan to run out and see if she was still in the parking lot. When Pussler learned that she had already left, he remarked, "We could have a problem."

Cecelia Schell was the K–Mart sales clerk who rang up the purchase of the stereo. The woman presented a check from Salmon's lost checkbook in the amount of $656.64 and Salmon's K–Mart check cashing courtesy card, telling Schell that the check had been preapproved. Because the check was for an amount over $50, Schell, in accordance with K–Mart practice, called Pussler to reapprove the check. Pussler arrived at the register accompanied by Christopher Canoles, K–Mart's loss prevention manager, and reapproved the check. When Schell asked for identification, the woman stated that she could not provide a driver's license because it had been revoked, and that her husband was driving. Because the woman was unable to present any identification other than the check cashing courtesy card, Schell again called Pussler. This time, Pussler arrived with Marlene Vasiliades, another K–Mart assistant manager. Although Vasiliades was unsatisfied with the woman's identi-

fication, Pussler again gave the check his approval. After the woman left, Canoles, Pussler, and Vasiliades discussed whether the check should have been approved.

Approximately a week after she closed her checking account, Salmon received a bank notice indicating that the closed account had been overdrawn. She called her bank, which provided her with the check number and amount, but could or would not tell her to whom the check was written. Salmon's bank advised her to wait for the payee to contact her.

On July 3 at about 6:30 p.m., Salmon came home from work to find a message to call one Witkowski at a particular number. The message contained no other information. Salmon immediately called this number, which turned out to be a K–Mart number. Thinking that her purse had been found, Salmon asked Witkowski, a K–Mart security guard, if she had her purse. Witkowski replied that she did not, but that she "had her bad check." Salmon asked for additional information, which Witkowski would not provide. She refused to give Salmon a chance to ask questions, stating only that she "did not have time" for Salmon, and "[w]e are going to get you. We know. We have got your check, and we know you." She then told Salmon to call another number and ask for Hinckle.

Hinckle turned out to be an officer with the Baltimore County Police Department. Salmon asked him to explain Witkowski's accusations, and he told her that K–Mart received a bad check drawn on her account, and that Witkowski's attempts to get her to honor it had produced no result. Salmon informed Officer Hinckle about her lost purse and that, until that afternoon, no one from K–Mart had contacted her. Hinckle told Salmon that Witkowski, acting for K–Mart, had sworn out a warrant for her arrest. After Salmon explained more completely about her lost purse, the officer told her that she should call him the next day, and in the interim he would check on the status of the warrant and speak to the District Court Commissioner.

Salmon's attempts to reach Hinckle the next day (July 4th) proved fruitless. She was told to call back the next day. Salmon called the Baltimore County Police Department at 7:00 a.m. the next day and told another officer the problem and that she wanted to do anything in her power to straighten out the situation. This officer suggested that she come to the police station. Salmon did so, and was arrested, booked, and charged. She was released on her own recognizance, and when she went home found a notice that the post office was holding a certified letter for her. The letter was notice from K–Mart of the dishonored check. The notice advised Salmon that she had 10 days from her receipt of the notice in which to tender payment, and that if not paid within the 10 days the matter would then be turned over to local prosecutorial authorities.[2] The notice was dated July 2, and signed by Witkowski. Witkowski had scrawled this message at the bottom of the notice: "This matter has been turned over to the County Police."

Salmon hired an attorney to represent her on the charge of uttering a bad check.[3] This attorney spoke to Canoles and to William Lowman, another K–Mart assistant manager, advising them that they had the wrong person. Salmon's attorney pointed out that the description of the woman who passed the check was dissimilar to that of Salmon. Canoles and Lowman stated that they had the right person and intended to prosecute. Canoles later obtained Salmon's photograph, and called the State's Attorney to tell him that

---

**2.** The notice provided in pertinent part:
"Please make prompt arrangement for payment of the full amount of the above check.
A. You have *10 Ten* days from receipt of this notice to tender payment of the amount due.
"If the amount due is timely paid, you will not be subject to legal proceedings. However, failure to make such payment shall serve as evidence of intent to defraud and, where permissible by law, would give us the option to turn over the check and all other information relating to this matter to the Prosecuting Attorney."

**3.** A different attorney represented Salmon in her subsequent civil action against K–Mart that is the subject of the appeal in the instant case.

charges had been instituted against the wrong person. The criminal case was called on August 13, 1985. Salmon appeared in court that day and was found not guilty when the State produced no evidence against her. Salmon subsequently filed the civil action in the instant case against Canoles, Witkowski and the K–Mart Corporation, seeking damages for malicious prosecution, false imprisonment, defamation, abuse of process, negligent supervision and negligence.

Summary judgment was entered for all appellants on Salmon's claims of defamation and negligent supervision. At the close of Salmon's case-in-chief, the trial court entered judgment for all appellants on the negligence claim, and judgment was entered for appellant Witkowski on the malicious prosecution claim. At the close of all the evidence, appellants renewed their motion for judgment and the trial court entered judgment for Canoles on the false imprisonment claim. The trial court entered judgment for all appellants on Salmon's abuse of process claim. The trial court denied appellants' motion for judgment on the malicious prosecution claim against Canoles and K–Mart. The trial court also ruled that, as a matter of law, Canoles, and therefore K–Mart, had no probable cause to institute criminal charges against Salmon.

## Probable Cause

Appellants K–Mart and Canoles contend that the trial court erroneously denied their motion for judgment, arguing that the undisputed evidence showed that they did indeed have probable cause to initiate and maintain the criminal action against appellee. We disagree.

In a malicious prosecution action, the plaintiff must prove that the defendant had no probable cause to institute or maintain the underlying criminal proceeding.

*Exxon Corp. v. Kelly*, 281 Md. 689, 693, 381 A.2d 1146 (1978).[4]

■ Probable cause is defined as a reasonable ground of suspicion supported by circumstances strong enough to warrant an ordinary and cautious person's belief that the accused is guilty. Sincere belief that the accused is guilty is not enough—there must be a reasonable basis for the belief. *Banks v. Montgomery Ward*, 212 Md. 31, 39, 128 A.2d 600 (1957). In evaluating probable cause, the focus is on those facts known to, and genuinely believed by, the one initiating (or continuing) the criminal proceeding. *Palmer Ford, Inc. v. Wood*, 298 Md. 484, 495, 471 A.2d 297 (1984).

Absence of probable cause is a mixed question of law and fact. That is, the *existence* of the facts relied upon to show absence of probable cause is a jury question, but whether the factual setting does or does not show absence of probable cause is a question for the court. *Palmer Ford, Inc.*, 298 Md. at 498, 471 A.2d 297.[5] The trial court in the instant case did not require the jury to determine a factual setting because the important facts were not disputed. In his instruction, the trial court informed the jury that the requisite element of lack of probable cause had already been established.

In *Montgomery Ward & Company v. Keulemans*, 23 Md.App. 81, 99, 326 A.2d 45 (1974), *aff'd*, 275 Md. 441, 340 A.2d 705 (1975), we held that there was no probable cause

**4.** The plaintiff must also prove that (1) the defendant initiated the criminal proceeding against the plaintiff; (2) the criminal proceeding ended in plaintiff's favor; and (3) the defendant acted with malice, or had a primary purpose other than bringing an offender to justice. *Exxon Corp.*, 281 Md. at 693, 381 A.2d 1146.

**5.** The preferred method is for the trial court to require the jury, using a special verdict form, to set forth the facts under which it finds the criminal action was initiated. The trial court then uses these factual findings to determine whether the defendant had probable cause. The more common but less desirable method is for the trial court to charge the jury hypothetically. *Palmer Ford, Inc.*, 298 Md. at 499, 471 A.2d 297.

where a security officer failed to investigate thoroughly an explanation offered by the accused before arresting him. In *Keulemans,* a Montgomery Ward security officer claimed to have seen a store shipping manager (appellee) steal a pair of sunglasses. Two hours later, the security officer arrested appellee, even though appellee told him he had purchased the glasses at Peoples Drug Store. Before taking him to the police station, the security officer questioned the manager of Peoples where appellee claimed to have purchased the glasses. The manager stated that Peoples no longer carried the sunglasses. The security officer, however, did not ask whether Peoples had carried sunglasses at the time appellee claimed to have purchased them. Appellee was acquitted and later brought a malicious prosecution action against the security officer and Montgomery Ward. *Keulemans,* 23 Md.App. at 90–93, 326 A.2d 45.

In *Keulemans,* we set out the factors to be considered in determining whether a security officer should investigate further before instituting a criminal proceeding.

"Circumstances known or believed by the accuser may be incriminating to the accused and yet may not so clearly indicate guilt that a reasonable man would initiate criminal proceedings without investigation. *In determining whether an investigation should be made, the following factors are important; the necessity of prompt action to prevent escape; the availability of information other than that in the possession of the accuser; the existence of a ready opportunity to obtain an explanation from the person accused or to ascertain his reputation; the character of the source from which the accuser's information comes.* The accuser may properly be required to make inquiry as to the veracity of his informants where his belief is founded upon their information. He may even be required to distrust the accuracy of his own observations when they are made under such circumstances that they may be suspected of inaccuracy. In all these cases the fact that an investigation might prove

dangerous, or the probability that it would be futile, are matters to be taken into account."

*Keulemans,* 23 Md.App. at 96, 326 A.2d 45, quoting Restatement of Torts § 662 at 408–09 (1938) (emphasis added). We went on to state that failure to conduct an adequate investigation may destroy probable cause because the test for probable cause is not limited to actual knowledge of the person initiating criminal proceedings, but rather extends to any knowledge which could or ought to have been gained by a reasonable person. There may be no probable cause where a proper investigation would have cleared away suspicious circumstances. *Keulemans,* 23 Md.App. at 98, 326 A.2d 45, quoting *Scott v. Dennett Surpassing Coffee Co.,* 51 A.D. 321, 64 N.Y.S. 1016, 1017–18 (1900).

Appellant does not contend that the trial court should have submitted the issue to the jury for it to determine a factual setting. Here, the trial court had an undisputed set of facts on which to make its probable cause determination. We hold that there was no error in the trial court's determination that Canoles, and therefore K–Mart, lacked probable cause. We explain.

The trial court correctly looked at all that was known by appellant Canoles when he set the criminal process in motion against appellee. The facts showed that appellant Canoles was in the immediate area when the check was approved, discussed the purchase with Pussler and with Vasiliades, and expressed his concern about the purchase. It is appellant's position that, even given these facts, probable cause existed because Canoles knew that the woman possessed both the checks and the courtesy card, and that no one had reported appellee's courtesy card as lost or missing.[6] According to appellants, these facts constituted compelling evidence that the woman was Salmon. They argue that, when the check was later dishonored and Salmon failed to contact Canoles about the overdraft, and his call

---

**6.** The K–Mart courtesy card contains the following statement: "If lost, report to the store that issued this card."

to her bank did not indicate that the check had been lost or stolen, probable cause to initiate criminal action existed as a matter of law.  The trial court disagreed with this analysis, denying appellants' motion for judgment because appellants should not have disregarded all the information they possessed which indicated that someone else wrote the check.

Analyzing the factors we set forth in *Keulemans*, it is clear that the ordinary prudent person would have investigated further before causing appellee to be arrested.  Here, appellant Canoles had observed that the check was approved without the customarily required photographic identification, and knew that his fellow employees were uncomfortable with the transaction.  When the check was returned "account closed," he should have considered all the information together and concluded that the matter warranted further investigation.  He had the information from appellee's courtesy card application and thus could have easily contacted her at home, or at her place of employment.  Also easily available to Canoles were the other K–Mart employees [7] who had information about the circumstances surrounding the offering of the check.  Here, as in *Keulemans*, there were no exigent circumstances necessitating a prompt arrest of appellee.  As in *Keulemans*, Canoles had taken some steps toward investigation but failed to follow through—he called appellee's bank to verify that the account was closed, but did not contact appellee.

We do not hold that in every case, or even in most cases, a store employee must investigate circumstances surrounding the offering of a check which is later dishonored.  In most cases, the dishonored check and the resulting failure to make it good would constitute probable cause.  Here, however, there was evidence showing that Canoles, as well as other K–Mart employees, had serious doubts about the woman's identity.  Because a reasonable person would have conducted a more thorough investigation, the probable cause for arrest was destroyed, as it was in *Keulemans*.

---

7.  Cecelia Schell, Kevin Hagan, John Pussler, and Marlene Vasiliades.

In light of this undisputed evidence, we hold that the trial court did not err in concluding that, as a matter of law, appellants lacked probable cause to institute criminal proceedings against appellee.

Preservation of Issue for Appellate Review

Appellants ask us to reverse the malicious prosecution judgment because appellee failed to establish malice, a necessary element of the tort. We decline to do so, as appellants failed properly to preserve the issue for our review.

At the close of appellee's case-in-chief, appellants made their motion for judgment, giving the trial judge a formal written motion accompanied by a 20–page memorandum of law. In the written motion, appellants asserted that appellee failed to prove that the criminal prosecution had been instituted "without probable cause and with malice." The memorandum of law supporting the motion contained a very brief discussion of malice. After presenting the trial judge with these materials, the jury was sent out of the courtroom and appellants' arguments on their motion were heard.

Appellants failed to mention malice in their oral argument to the trial judge and instead focused on probable cause. The trial judge's denial of appellants' motion, issued immediately afterward from the bench, reflected precisely what was argued before him: he gave careful and detailed consideration to the probable cause question, but made no specific ruling as to malice. After presenting their defense witnesses, appellants renewed their motion for judgment, again making no specific mention of malice. Indeed, appellants' counsel stated:

"In reference to the malicious prosecution, Your Honor, I think the court has exhaustively looked at all of those issues this morning on the original motion. I don't think that the posture of that has changed in spite of his testimony."

Rule 2–519 provides in pertinent part:

"(a) **Generally.**—A party may move for judgment on any or all of the issues in any action at the close of the evidence offered by an opposing party, and in a jury trial at the close of all the evidence. *The moving party shall state with particularity all reasons why the motion should be granted.* No objection to the motion for judgment shall be necessary. A party does not waive the right to make the motion by introducing evidence during the presentation of an opposing party's case." (Emphasis added.)

We will not ordinarily decide an issue which has not been presented to or ruled upon by the trial court. Rule 8–131; *Washington Homes, Inc. v. Baggett,* 23 Md.App. 167, 171, 326 A.2d 206 (1974), *cert. denied,* 273 Md. 723 (1975). The rationale behind this Rule is judicial economy—counsel must bring his or her client's position to the attention of the trial court so that it can pass upon and possibly avoid any errors in the proceeding.

In the instant case, the question then becomes: was appellants' mention of lack of malice in the written material counsel handed to the trial judge "particularity" within the meaning of Rule 2–519(a), so that it can fairly be said that the trial judge could seriously consider and rule upon the issue, thus preserving it for our review? We do not think so.

Appellants' counsel could have, but did not, ask the trial judge to recess and consider each and every point in its 20–page memorandum of law. Such a detailed memorandum had to be prepared in advance, before the defendant knew exactly the shortcomings in plaintiff's case-in-chief.[8] In the instant case, the trial judge gave appellants ample opportunity to ask him to make a specific ruling on malice, both at the close of appellee's case, and again at the close of

---

8. In the instant case, the written motion and 20–page legal memorandum were filed and given to the trial judge on October 9, 1987, the same day appellee concluded her presentation of her case-in-chief. The trial judge had no prior opportunity to read them.

all the evidence. Appellants did not do so, thereby abandoning this line of attack on plaintiff's case. We therefore hold that the mere referral to a possible reason for judgment in a written motion and supporting memorandum, followed by an oral argument in which the issue is ignored and not further addressed, constitutes an abandonment of that issue. The party cannot later assert the issue on appeal.

A contrary holding would have the result of allowing defense counsel to prepare elaborate written "boilerplate" motions and corresponding long legal memoranda in advance in order to preserve each and every conceivable issue, but then orally argue only those issues which look promising after plaintiff has presented his or her case-in-chief. Such a result ignores the purpose of Rule 2–519(a). The trial judge must be apprised of precisely the issue upon which he or she is asked to make a ruling. In the instant case, the trial judge, even if he *had* an opportunity to read appellants' lengthy memorandum, reasonably could have concluded that appellants had abandoned an argument mentioned only in fine print and not again in court.

### False Imprisonment

Appellants contend that the trial court erred in denying their Motion for Judgment on appellee's false imprisonment claim. They argue that the undisputed facts show appellee voluntarily submitted herself for arrest, thus consenting to the deprivation of her liberty. Appellants also argue that her false imprisonment claim cannot be maintained because her arrest was made pursuant to a facially valid arrest warrant. We disagree and will explain.

In a false imprisonment action, a plaintiff must prove that he or she was deprived of his or her liberty by another without his or her consent and without legal justification. *Fine v. Kolodny*, 263 Md. 647, 651, 284 A.2d 409 (1971), *cert. denied*, 406 U.S. 928, 92 S.Ct. 1803, 32 L.Ed.2d 129 (1972). Legal justification is the equivalent of legal authority: that is, in the usual case an action for false imprisonment will not lie where the arrest is effected pursu-

ant to a valid arrest warrant. *Shipp v. Autoville Ltd.*, 23 Md.App. 555, 570, 328 A.2d 349 (1974), *cert. denied*, 274 Md. 725 (1975). *See also Brewer v. Mele*, 267 Md. 437, 440, 298 A.2d 156 (1972).

Appellants' argument that appellee consented to her detention is unpersuasive. Rule 2–519(b) requires a trial court to consider all inferences in the light most favorable to the party against whom the motion is made. The trial court is required to submit an issue to the jury unless the evidence and inferences lead to conclusions from which reasonable minds could not differ. *Lauer v. Scott*, 12 Md.App. 555, 557, 280 A.2d 917 *cert. denied*, 263 Md. 716 (1971).[9]

■ In the instant case, appellee testified that she had been working with Officer Hinckle in order to rectify matters. When she could not reach him, she spoke to another police officer at the Essex station, testifying that she told the officer on the telephone that she wanted to come in and straighten out the situation, and that "I'm not turning myself in because I'm not guilty, but I will come and do anything or make my appearance to correct it." She did appear at the Essex station and was told that she should go to the Towson station where she was told to wait. After she waited for about 30 minutes, she was arrested. It was a reasonable inference that she had not voluntarily consented to her arrest, but had wanted to resolve the situation by appearing in person and speaking to the police. Once she was there, appellee had no legal right to resist lawful arrest under a facially valid warrant. *See Rodgers v. State*, 280 Md. 406, 421, 373 A.2d 944 (1977), *cert. denied*, 434 U.S. 928, 98 S.Ct. 412, 54 L.Ed.2d 287 (1977).

■ Appellants also contend that the arrest was legally justified and that therefore the false imprisonment action cannot be maintained. This is incorrect. Although a private person does not become liable for false imprisonment

---

9. *Lauer* was decided under the old Rule governing directed verdict motions, Md. Rule 552. Rule 2–519 incorporates the same standard.

for merely giving mistaken information to authorities, the opposite is true where a person *knowingly* gives false information to an arresting officer. *Newton v. Spence,* 20 Md.App. 126, 316 A.2d 837 *cert. denied,* 271 Md. 741 (1974). In *Newton,* we held that a defendant may be found civilly liable for false imprisonment where he has given a false report of an alleged misdeed which resulted in the detention of the plaintiff, if the false information was a determinative factor in the decision to arrest. *Newton,* 20 Md.App. at 135–36, 316 A.2d 837.

In the instant case, even though Witkowski did not testify, there was evidence from which a jury could have concluded that she made deliberate misrepresentations to the Commissioner who issued the charging document. Although what Witkowski told him may have been technically correct, *i.e.,* that a certified letter had been sent to appellee, Witkowski neglected to tell the Commissioner that she had mailed it only the day before, and that appellee probably had not yet received it. There was also evidence showing that Witkowski, at the time she spoke to the Commissioner and told him that she had made several phone calls to appellee, she had at that time spoken only to appellee's son, who told Witkowski that his mother was at work. It is a reasonable inference that if the Commission had known of these facts, he would not have issued the warrant.

We hold, therefore, that the trial court did not err in denying appellants' motion for judgment and submitting the issue of false imprisonment to the jury.

## CROSS–APPEAL

### Probable Cause as to Witkowski

In her cross-appeal, Salmon contends that the trial court should not have granted Witkowski's motion for judgment on the malicious prosecution claim and argues that Witkowski instituted the criminal proceedings against her without probable cause.

There was no evidence at trial indicating that Witkowski was in the K–Mart store on June 7, 1985, or that she knew that other K–Mart employees were suspicious as to the identity of the woman who passed the check. The trial court found that lack of probable cause existed for Canoles, and therefore K–Mart, because Canoles was clearly aware of the other employees' hesitation to approve the woman's check because of her unkempt demeanor and lack of identification. Because there was no evidence of a similar knowledge on Witkowski's part, Salmon did not carry her burden of proving that Witkowski acted without probable cause. Therefore, we hold that the trial court correctly granted Witkowski's motion for judgment.[10]

### K–Mart's Motion in Limine

Salmon contends that the trial court erred in granting K–Mart's motion *in limine* to exclude Officer Hinckle's testimony that he told Witkowski that she should wait until he completed an investigation before pressing charges. The trial court also excluded any evidence pertaining to Baltimore County Police Department Regulations in regard to bad checks. We hold that the trial court did not err in excluding this testimony.

Evidence is relevant if it has any tendency to make the existence of a material fact more probable or less probable than it would otherwise be without the evidence and, therefore, must be admitted absent a contrary exclusionary rule. *Blondes v. Hayes,* 29 Md.App. 663, 668, 350 A.2d 163 (1976). Relevant evidence may be excluded, however, if its probative value is outweighed by prejudice. A trial judge, therefore, has broad discretion to exclude otherwise relevant evidence which might be improperly assessed by the jury. *Blondes,* 29 Md.App. at 668–72, 350 A.2d 163.

---

10. Apparently, Salmon was notified by the bank that the check was returned on or about June 17 based on insufficient funds; hence, over 10 days had elapsed prior to the issuance of the warrant. Md. Code Ann. Art. 27, § 144 (1957, 1987 Repl.Vol.). In any event, this issue was not raised in cross-appellant's brief.

██ We do not agree with K–Mart that Hinckle's testimony that he told Witkowski to wait for him to conduct an investigation was a lay opinion and, therefore, inadmissible. The record shows that Salmon offered this evidence in order to show that Witkowski's actions were unreasonable and that, therefore, she lacked probable cause. This testimony, however, would have told Witkowski nothing new as to the factual circumstances surrounding the passing of the check on June 7. As mentioned previously, in a malicious prosecution action, the focus is on the facts known to the party at the time of instituting the criminal proceeding. *Brewer v. Mele,* 267 Md. 437, 451, 298 A.2d 156 (1972). Additionally, such testimony carried a substantial risk of prejudicing the jury. The jury might have erroneously concluded that, because a police officer told Witkowski to wait before proceeding, Witkowski was legally prevented from filing criminal charges against Salmon.

██ The Baltimore County Police Regulations were simply not relevant as they had no bearing on Witkowski's knowledge of the facts on which she based a belief that Salmon had passed the check. In addition, if admitted, it was entirely possible that the jury would give them undue weight, as the regulations are official police procedure. The regulations were not, however, binding upon Witkowski in her capacity as a private security officer and are, therefore, irrelevant to the instant case. We therefore hold that the trial court did not err in excluding this evidence.

### Abuse of Process

Salmon contends that the trial court erred in entering judgment for K–Mart on her abuse of process claim. We disagree and will explain.

██ The elements of the tort of abuse of process are: (1) an ulterior purpose; and (2) a deliberate act in the use of the process not proper in the regular conduct of the proceeding. There must be a definite act or threat aimed at an objective outside the purpose of the process and no

liability is imposed where a defendant has merely carried out the process to its authorized conclusion, even though with bad intentions. *Palmer Ford, Inc.*, 298 Md. at 511, 471 A.2d 297. In *Palmer Ford*, the Court of Appeals found that the trial court should not have entered a directed verdict for the defendant because there was sufficient evidence to create a reasonable inference that the defendant had used criminal proceedings to collect a debt from the plaintiff. The Court stated that a creditor cannot use the State's criminal courts as a private collection agency. *Palmer Ford*, 298 Md. at 511–12, 471 A.2d 297. The sufficient evidence in *Palmer Ford* was a letter written to the plaintiff's father in which the defendant, a Palmer Ford employee, requested that the father meet with him to discuss his son's bill and the allegedly illegal manner in which the plaintiff had obtained his vehicle after the repairs were completed.[11] The defendant also met with the plaintiff's mother, telling her that unless the money was paid her son would be arrested and sent to jail. The mother told the defendant that she would have to borrow the money, over $900, from her credit union. After her son was arrested, she delivered a credit union check to the defendant and stated: "I presume that this arrest business is all going to be over with," and that he replied, "Yes. All we want is our money." *Palmer Ford*, 298 Md. at 489–90, 471 A.2d 297.

Abuse of process and malicious prosecution are often confused. The crucial difference between the two torts is that abuse of process is concerned with the improper use of the process in a manner not contemplated by law *after* it has been issued. Malicious prosecution, on the other hand, is concerned with maliciously causing criminal process to issue for its proper purpose, but without proba-

---

11. The plaintiff was told by a Palmer Ford employee that he could receive his car if he left $400 under the trash can in the men's room. He left the money there and took with him his car keys and receipts stamped "paid" which the employee left for him under the trash can. *Palmer Ford*, 298 Md. at 494, 471 A.2d 297.

ble cause. *Herring v. Citizens Bank & Trust Co.*, 21 Md.App. 517, 529, 321 A.2d 182 *cert. denied,* 272 Md. 742 (1974). An essential element of abuse of process is an actual seizure of the plaintiff's person or property. *Herring,* 21 Md.App. at 536, 321 A.2d 182 quoting Am.Jur.2d, 4 at 253–54 (2d ed. 1962).

A close look at Salmon's evidence indicates that she failed to provide enough evidence to support an inference that K–Mart used the criminal proceedings in order to either collect $656.64 from her or to make her sign a release of civil liability. She argues that the certified letter sent to her by Witkowski was an impermissible attempt to extort the money from her, upon threat of criminal prosecution. The bad check notice sent by Witkowski, in our opinion, does not rise to this level. It merely states that if payment is not made, K–Mart may consider turning the matter over to the proper person for prosecution. K–Mart is entitled to attempt to bring what it honestly believes to be a criminal offender to justice. The failure of payment would motivate them to seek punishment of people who fraudulently write checks, a proper purpose of the criminal system. Salmon presented no evidence showing that K–Mart continued to demand the money from her and offered to drop the charges in return. There was no proof presented by Salmon that payment was Witkowski's "improper purpose" within the meaning of the tort and that she pursued Salmon's prosecution to effect this purpose.

There was a similar lack of evidence put forward by Salmon that the criminal proceedings against her were instituted or continued in order to force her to sign a release of civil liability in favor of K–Mart. Canoles' statement to Salmon's attorney that he would expect a release does not rise to the level of proof the Court of Appeals found sufficient in *Palmer Ford.* Salmon offered no evidence showing that Canoles offered to drop the proceedings in exchange for the release and deliberately continued the proceedings in order to accomplish this object. We, there-

**590**

fore, hold that the trial court did not err in granting K–Mart's motion for judgment.

JUDGMENTS AFFIRMED. COSTS TO BE PAID ONE–HALF BY APPELLANTS AND ONE–HALF BY CROSS–APPELLANT.