554 A.2d 1264

**Harry L. LAWS**

**v.**

**Gregory THOMPSON, et al.**

**No. 783, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

March 29, 1989.

Concurring Opinion April 26, 1989.

666

Howard J. Schulman, Baltimore, for appellant.

Francis B. Burch, Jr. (Eric B. Miller, Piper & Marbury, on the brief), Baltimore, for appellees, Stiller & Frank, Bernstein, Conaway & Goldman.

Gilbert A. Hoffman (Robert K. Nead, O'Doherty, Nead, Hoffman, Baltimore, and William A. Saltysiak, Towson, on the brief), for appellees, Thompson & Met.

(J. Joseph Curran, Jr., Atty. Gen., and Ronald M. Levitan, Asst. Atty. Gen., on the brief), Baltimore, for appellee, Howard B. Gersh.

Argued before BISHOP, ROSALYN B., BELL and FISCHER, JJ.

ROSALYN B. BELL, Judge.

In a suit claiming defamation, false imprisonment, malicious prosecution and abuse of process, the Circuit Court for Baltimore City granted summary judgments for defendants Gregory Thompson, Metropolitan International, Inc., Shale D. Stiller, and Frank, Bernstein, Conaway & Goldman, against Harry L. Laws. Laws has appealed both from the summary judgments and the quashing of a subpoena

against an assistant State's Attorney whom he sought to depose. The issues on appeal are whether the court erred in

—granting summary judgment for the defendants as there was evidence that they deliberately gave false information to the police and hence were not entitled to "good faith" immunity;

—granting summary judgment for all defendants because there was no dispute of material facts, and that judgment should have been entered as a matter of law;

—granting the motion to quash the subpoena served on the assistant State's Attorney based on executive privilege.

We reverse and remand.

The facts vary widely, depending on who recounts them. Indeed, it is precisely this factual disparity which made summary judgment inappropriate. We must provide a setting, however, against which we view the specifics. We begin by setting forth a general factual background, identifying the persons involved. We then narrate Laws's version of the facts leading to his arrest and to his subsequent civil suit; this will be interspersed with some reference to the account of defendants Thompson, Metropolitan, Stiller, and Frank, Bernstein.

The State of Maryland Deposit Insurance Fund Corporation (MDIF), Receiver for Old Court Savings and Loan, retained Stiller and the law firm in which he is a partner, Frank, Bernstein, as counsel. MDIF obtained a judgment in the Circuit Court for Baltimore City on June 10, 1986.[1] against Galleria Enterprises of Maryland, Ltd. (Galleria), which owned and operated the Gucci store formerly located at 122 Redwood Street in Baltimore City.

---

1. The judgment was in the amount of $400,000; interest, late charges, and costs to be assessed.

Stiller sought to levy on Galleria's property to satisfy MDIF's judgment, and on June 26, 1986, he filed a Request for a Writ of Execution, asking the sheriff to seize the property, including inventory. During the next few weeks, MDIF employees received reports that merchandise was being removed from the Redwood Street store.[2] At a meeting held on either July 14 or 15 at Frank, Bernstein's offices, and attended by Stiller and MDIF employees, it was decided to hire a security guard service, Metropolitan, to protect the merchandise during the hours the store was closed. On July 16, 1986, Metropolitan dispatched its employee, Gregory Thompson, to the store. Thompson's instructions were that no one, including owners and employees, were to enter the store after it was closed.

At about 8:00 p.m. that same day, Laws, an employee of Galleria, was electronically paged by two of Galleria's owners.[3] The owners asked Laws to come to the Gucci store. Accompanied by his girlfriend, Zina, Laws drove his own car to the store. Zina remained in the car, but reminded Laws not to forget to retrieve a picture of their daughter, which he kept in his store office. Laws looked for the owners outside the front entrance of the store, but no one was there. Because the front entrance on Redwood Street was barricaded by a metal roll-down cage, Laws entered the building from Calvert Street, walked through the building's lobby, went down a staircase, using the basement door to gain entry of the store.[4] The building's night custodian

---

**2.** Laws contends that this information was unverified and false.

**3.** Laws's duties primarily consisted of being a night watchman and running errands.

**4.** The Gucci store was situated on the northwest corner of Redwood and Calvert Streets in an office building which also housed a bank. Gucci's had showroom floors at the Redwood Street level and in the basement of the building. The front entrance was on Redwood Street; the basement level, in addition to a showroom, contained the store's offices. On Calvert Street, by the bank entrance, was a door to the building's lobby; there was a private entrance to the Gucci store at the rear of the lobby. Also located at the rear of the lobby was a

was in the lobby and observed Law's entry. The Galleria owners were waiting for Laws inside the store; they instructed him to fill up the gas tank of a store van. Laws left, refueled the van, and returned it to the owners. Laws was on his way out of the store with the owners when he remembered Zina's admonition to get his daughter's picture —he went back into the store alone to retrieve it. When he got back outside, he encountered security guard Thompson.

Thompson's version of the tale is different. Thompson maintained that Laws had approached him as he was guarding the store, offering him money if he would "look the other way" while Laws entered the store. Thompson refused the alleged bribe, and shortly thereafter, as he was shining his flashlight into the Gucci store windows, he saw a masculine figure lurking inside.[5] Thompson checked with the night custodian, who identified Laws as having been inside the building. Thompson apprehended Laws outside the store, and called the police. Baltimore City Police Officer Innes Foster, among others, responded to the call.

According to Stiller, that evening at about 10:00 p.m., he received a phone call from a Metropolitan agent. Metropolitan told Stiller that the security guard had reported that someone had attempted to break into the store and bribe the guard, and subsequently was seen ducking behind a counter in the closed store. Stiller was also told the police were at the scene and would contact him.

Thompson told Officer Foster that he had been hired to guard the Gucci store and to prevent anyone from entering. In order to ascertain precisely *who* had hired the security guard, Officer Foster called Thompson's supervisor at Metropolitan, telling Metropolitan that he wanted to verify their legal control over the store and the reason for not letting

---

stairway, which led to another door in the Gucci basement. There were, therefore, three ways to get into the Gucci store.

**5.** In deposition, Thompson stated that he could not identify or describe the person he saw duck down, "I say the figure of a man, that's all I can recall."

the owners and employees go into the store. Metropolitan gave Officer Foster Stiller's telephone number. Foster called Stiller, informing him that a man named Harry Laws had been apprehended. Stiller told him that he was MDIF's attorney, and he had seized all records and merchandise of the store, and had issued the order that no one was to enter. According to Stiller, he did not know that Laws was an employee, or that he was authorized to be in the store, nor did he ask who Laws was. Officer Foster's recollection differs—he stated that he *did* tell Stiller that Laws was a Gucci employee. Officer Foster asked Stiller whether he wanted Laws arrested. Stiller asked the officer what was usually done in similar cases; the officer responded that *if* Stiller and MDIF had legal control of the store, and *if* Laws had no legitimate purpose there, then Laws could be charged with burglary. According to Officer Foster, Stiller responded, "Well, then, let's just do what you normally do, and we will lock him up."

Laws was arrested. At the time of his arrest, he had in his possession his employee payroll stub, a 5″ × 7″ picture of his daughter, his keys to the store, and approximately $10.00. Laws had no Gucci merchandise. Based on the information Stiller provided, *i.e.*, that MDIF had legal control of the store, and that provided by Thompson, *i.e.*, that Thompson had seen Laws inside the store, Officer Foster swore out a complaint. Laws was charged with storehouse breaking, in violation of Art. 27, § 31B (1957, 1987 Repl. Vol.), a misdemeanor punishable by up to six months imprisonment, or a fine of up to $500, or both. Laws spent the night in jail; he was released in the early morning of July 17. A trial date was scheduled for August 11.

On July 18, the sheriff officially executed the writ, taking possession of the store premises and merchandise. That same day, Linda Richards, a Frank, Bernstein associate, called Deborah Chasanow of the Attorney General's office because:

"Debbie Chasanow is a friend of mine. I admire her abilities in criminal law very much so I gave her a call to

tell her what we believed was going on and to ask her whether this was a crime. I believe that is what my purpose in calling her was. I believe it was Debbie who said that it could be obstruction of justice and what we would need to do some research to see whether or not the taking of inventory by debtors like Mrs. Kenny and Mr. Burbage constituted obstruction of justice." [6]

Laws's misdemeanor offense was subsequently assigned to Howard Gersh, a senior felony prosecutor at the circuit court level of the Baltimore City State's Attorney's office. On July 22, 1986, Stiller met with Gersh.[7] On August 7, Gersh returned Richard's telephone call, advising her that he could not pursue the burglary charge against Laws. Richard's notes of her conversation with Gersh show that Gersh stated that he could not "figure out any offense" with which Laws could be charged. The charges against Laws were nolle prossed.

After Laws's civil suit was filed, counsel for Laws sought to depose Gersh and to obtain some notes Gersh made in regard to his meeting with Stiller. The subpoena was quashed and the trial court granted summary judgment for all the defendants. This appeal followed.

### THE SUMMARY JUDGMENT

We enter again the familiar arena of how to evaluate a summary judgment motion. Rule 2–501 provides, in pertinent part, that

"[t]he court shall enter judgment in favor of or against the moving party if the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that there is *no genuine dispute as to any material fact and that the party in whose favor judgment is entered is*

---

**6.** This excerpt is from Richard's deposition; she admitted making the call and provided this explanation.

**7.** We have little information in regard to the substance of this meeting because Stiller had no recollection of the specifics of the meeting, and prosecutor Gersh prevailed on his claim of executive privilege.

*entitled to judgment as a matter of law."* (Emphasis added.)

The purpose of the summary judgment procedure is to dispose of cases where there is no genuine factual controversy. *Harris v. Stefanowicz Corp.,* 26 Md.App. 213, 218, 337 A.2d 455 (1975). Summary judgment is not, however, designed as a substitute for trial, but a hearing to determine whether a trial is necessary. *Brown v. Dart Drug Corp.,* 77 Md.App. 487, 491, 551 A.2d 132 (1989). "The critical question for the trial court on the motion for summary judgment is whether there exists a genuine dispute as to a material fact and, if not, what the ruling of law should be upon those undisputed facts." *Brown,* 77 Md.App. at 493, 551 A.2d 132.

In resolving whether a material fact remains in dispute, the court must accord great deference to the party opposing summary judgment. Even where the underlying facts are undisputed, if those facts are susceptible of more than one permissible inference, the trial court is obliged to make the inference in favor of the party opposing summary judgment. *Liscombe v. Potomac Edison Co.,* 303 Md. 619, 621, 495 A.2d 838 (1985). The court should never attempt to resolve issues of fact or of credibility of witnesses—these matters must be left for the jury.

All four defendants based their respective summary judgment motions on contentions that (1) because they were at all relevant times acting as good faith agents of MDIF, they were therefore entitled to qualified immunity; and (2) that there was no genuine dispute as to any material fact and that they were entitled to judgment as a matter of law. We will consider the qualified immunity first. Because we hold that the qualified immunity involved in the instant case should not have resulted in the entry of summary judgment for the defendants, we later look to the undisputed material facts to see if summary judgment was appropriate even absent immunity. Each of Laws's (appellant's) causes of

action will be handled separately, as the prima facie elements in each, of course, will differ.[8]

## QUALIFIED IMMUNITY

Section 9 of Chapter 6 of the Acts of the First Special Session of the General Assembly of 1985, as amended by Section 2 of Chapter 12 of the Acts of the General Assembly of 1986 (House Bill 1374) provides: [9]

"SECTION 9. AND BE IT FURTHER ENACTED, that no claim of any nature whatsoever shall arise against, and no liability shall be imposed upon, the Fund Director or any officer, director, agent, or employee of [MDIF] ... for any statement made or actions taken in good faith exercise of the powers granted and duties imposed under this Act...."

The trial court's summary judgment in favor of all defendants was based on § 9. The trial judge found that it operated as a complete bar to any action against a director, agent, or employee of MDIF; he based this decision on what he viewed as insufficient evidence of bad faith on the part of the defendants. We hold that the trial court erred in this interpretation, and explain.

The general purpose of the Act was to clarify the powers of MDIF; the Act's preamble states that one such clarification needed, which is embodied in § 9, was "granting qualified immunity to agents of the Fund under certain circum-

---

**8.** A recap of the claims may be helpful: appellant made malicious prosecution, defamation, and false imprisonment claims against all four defendants; appellant sued only Stiller and Frank, Bernstein for abuse of process. Appellant made an additional claim of defamation against Stiller and Frank, Bernstein, based on a letter subsequently written by Stiller repeating Thompson's allegation of bribery.

**9.** Section 9 is not codified in Title 10 of Md.Fin.Instit.Code Ann.; other parts of House Bill 1374, however, do appear in Title 10. One possible explanation is that House Bill 1374 did not give § 9 a Title 10 designation (perhaps because the entire bill was emergency housekeeping legislation); therefore, neither did the Code's publisher, Michie. Section 9 *does* appear in its entirety in the Editor's Note to § 10–101. In any case, we are satisfied that it indeed is law, albeit difficult to locate.

stances and providing certain exceptions." [10] (Emphasis in original.)

According to the testimony of Ben Bialek, Chief Legislative Officer, testifying before the Savings and Loan Industry Committee and the Economics Matters Committee, "the amendment to § 9 of Chapter 6 grants *qualified immunity* to agents of MDIF. The proposed amendment is necessary to assure that qualified private sector individuals will contract with MDIF as agents to administer a conservatorship or receivership estate." (Emphasis added.)

■ Appellant argues that legislative history of House Bill 1374 indicates that qualified immunity was intended only for contract actions and not for torts. He refers us to no such legislative history directly supporting this conclusion, nor did we locate any independently. The plain words of the Act state that "no claim of any nature whatsoever" is included. We fail to see how the meaning could be any plainer and hold the qualified immunity extends to tort actions as well as to other claims.

■ It is undisputed that Stiller and Frank, Bernstein acted as general counsel to MDIF as Receiver for Old Court Savings and Loan, Inc. As attorneys for MDIF acting within the scope of their representation, Stiller and Frank, Bernstein were MDIF's agents. *See, e.g., Salisbury Beauty Schools v. State Bd. of Cosmetologists*, 268 Md. 32, 45, 300 A.2d 367 (1973). Therefore, the qualified immunity applies to good faith activities of Stiller and Frank, Bernstein. Appellees Thompson and Metropolitan are entitled to the same qualified immunity as agents of MDIF.[11] They were following the orders of MDIF's attorney insofar as the security of the store was concerned.

The operative term in the instant case, however, is "qualified immunity;" this is the term used in the preamble of House Bill 1374. The § 9 immunity is described further as "qualified immunity" in the legislative history we referred to earlier, *i.e.*, the testimony of Ben Bialek before the Savings and Loan Industry Committee. There is a distinc-

---

**10.** Underlining, in original, indicates amendments to HB 1374.

**11.** Since Metropolitan's liability is predicated on that of its employee, Thompson, we need not separate them for discussion purposes.

tion between qualified immunity and absolute immunity. For example, in a defamation context, the distinction is that the former protects only those acts performed in good faith, while the latter shields *all* acts, no matter how malicious. *See, e.g., Chamberlain v. Mathis*, 151 Ariz. 551, 554, 729 P.2d 905, 908 (1986). "Absolute immunity" defeats a suit at the very outset, as long as the official's actions were within the scope of immunity; however, the fate of an official with "qualified immunity" depends upon the circumstances and motivations of his actions, as established by the evidence at trial. *See Slavin v. Curry*, 574 F.2d 1256, 1262 (5th Cir. 1978). The qualification in the instant case, of course, is good faith, *i.e.*, the defendants are immune from this suit if the undisputed facts show that they were acting in good faith.

A question of good faith "almost always" presents an issue of fact for trial, *Freed v. Worcester County Department of Social Services*, 69 Md.App. 447, 456, 518 A.2d 159 (1986), *cert. denied*, 309 Md. 47, 522 A.2d 392 (1987); *Cardin v. State*, 73 Md.App. 200, 213, 533 A.2d 928 (1987); and generally, summary judgment is inappropriate where motive or intent is at issue since inferences must be resolved against the moving party. *Berkey v. Delia*, 287 Md. 302, 305–06, 324–26, 413 A.2d 170 (1980); *Schlossberg v. Epstein*, 73 Md.App. 415, 423, 534 A.2d 1003 (1988). The rationale is:

> "[W]hen the disposition of a case turns on a determination of intent, courts must be especially cautious in granting summary judgment, since the resolution of that issue depends so much on the credibility of the witnesses, which can best be determined by the trier of facts after observation of the demeanor of the witnesses during direct and cross-examination." (Citations omitted.)

*Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir.1979);[12] *accord Berkey*, 287 Md. at 324–26, 413 A.2d

---

**12.** The Maryland summary judgment rules are derived from the Federal Rules of Practice and Procedure. The Maryland courts, therefore, consider the interpretation of the federal rules persuasive concerning the Maryland Rules. *Metropolitan Mtg. Fund, Inc. v. Basiliko*, 288 Md. 25, 27, 415 A.2d 582 (1980).

170, quoting *Goldwater v. Ginzburg,* 261 F.Supp. 784, 788 (S.D.N.Y.1966), *aff'd,* 414 F.2d 324, 337 (2d Cir.1969), *cert. denied,* 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970). Intent is "peculiarly inappropriate" for decision by summary judgment because it "can rarely be established by direct evidence, and must often be proved circumstantially and by inference." *Zilg v. Prentice–Hall, Inc.,* 515 F.Supp. 716, 719 (S.D.N.Y.1981); *accord Berkey,* 287 Md. at 305–06, 324–26, 413 A.2d 170; *Cardin,* 73 Md.App. at 213, 533 A.2d 928.

▪ What, then, did appellees [13] need to show to prevail on their qualified immunity defense at the summary judgment level? We phrase the question in this manner to illustrate that the burden at the summary judgment hearing was on *appellees* as movants to show that the undisputed material facts established their good faith, and not upon appellant as plaintiff.

The definition of good faith, of course, depends on the context, *i.e.,* the particular statute or other rule of law in which it is used. We are bereft of a precise definition of good faith as it is used in § 9, as there is no statutory definition and no cases construing the term.

"Good faith" is a concept frequently encountered in the law; therefore, we turn to the term as it has been defined in similar contexts. Good faith is an intangible quality, with no precise technical meaning. It encompasses, *inter alia,* an honest belief, the absence of any malice or of any design to seek an unconscionable advantage; an individual's good faith is conceptualized within his or her own mind and inner spirit and, therefore, may not be conclusively established by his or her protestations alone. *Doyle v. Gordon,* 158 N.Y.S.2d 248, 259–60 (N.Y.1954). Good faith requires an honest effort to ascertain the facts on which an exercise of power rests, and an honest determination from these facts. *Colket v. St. Louis Union Trust Co.,* 52 F.2d 390, 391 (8th Cir.1931).

---

**13.** We will distinguish between the four appellees only when necessary for discussion purposes.

Appellee Stiller, in his affidavit supporting summary judgment and asserting the § 9 qualified immunity defense, stated that he had acted in good faith. But, as we underlined previously in our review of the cases, mere professions of good faith are not persuasive evidence. *See Berkey*, 287 Md. 316, 413 A.2d 170. The problem that Stiller could not overcome in his supporting affidavit was Officer Foster's statements—statements which conflicted with Stiller's and Frank, Bernstein's version of events and, if believed, could negate a good faith defense on the part of Stiller and Frank, Bernstein.

For example, in his statement of charges against appellant, Officer Foster stated:

"I spoke with Shale Stiller, attorney for Maryland Deposit Insurance Fund. Mr. Stiller stated that Gucci's was closed this date by them as a result of the indictment against Jerome Cardin [and] his office had seized all records and merchandise of the store and had hired the security company. He had given the security company orders that no one, including owners or employees, were to enter the store after it was closed."

Officer Foster testified in deposition:

"Several things I am sure of. If you want to hear them. One, Mr. Stiller told me that MDIF had taken control of that store on that date, and they had hired that guard to keep out the employees and the owners of the store. That was the purpose of it. ... That particular point was important to me that night, or if it wasn't important to me, I wouldn't have locked up Mr. Laws, because it was important to me, as far as I am concerned, unless somebody has control of Gucci's, you have no reason to lock Mr. Laws up. He is an employee of the store, he goes in the store and has the key. If the owners of Gucci is [sic] still in control of Gucci's, then there is no crime."

In his affidavit, Stiller simply states that he *did not* make these statements to Officer Foster, and denied that Officer Foster told him appellant was an employee.

■ Thus, we do not have undisputed facts unquestionably showing that appellees Stiller and Frank, Bernstein

acted in good faith. Rather, we are faced squarely with an issue of credibility. Summary judgment is just not the procedure by which credibility is evaluated. If a jury were to believe Officer Foster, Stiller told the officer that he had legal control. In reality, Stiller did not have legal control over the store merchandise until two days later, when the sheriff executed the writ. Thus, the jury could infer bad faith because Stiller told appellee Metropolitan not to let anyone into the store, although Stiller knew he (and Frank, Bernstein) did not have this right. Additionally, a jury could infer bad faith from the fact that Stiller encouraged appellant's arrest, knowing he had no legal right to lock an employee out of the building. Moreover, a jury could infer *continued* bad faith on appellees Stiller's and Frank, Bernstein's part because of Stiller's pursuit of appellant's prosecution even after Stiller and Frank, Bernstein knew the entire state of affairs. Indeed, a jury could also infer from Richards' deposition testimony in regard to the call to her friend at the Attorney General's office that she had been assigned to the case for the express purpose of discovering a creative criminal charge which would "stick" to appellant. After all, it was not MDIF's mission to prosecute criminally employees of Galleria—that simply was not one of MDIF's functions. We hold that appellees Stiller and Frank, Bernstein failed to establish that there was no genuine issue whether their actions were taken in good faith.

■ As far as security guard Thompson and his employer Metropolitan were concerned, an analogous situation exists which should have prevented the entry of summary judgment on their § 9 qualified immunity defense. That is, appellant asserts that he at no time attempted to bribe Thompson. Thompson insists otherwise. If a jury were to believe appellant, Thompson would have been acting in bad faith—indeed, extremely bad faith because, if appellant is to be believed, Thompson's account is a total fabrication, perhaps concocted to cover a less than vigilant observation of the store premises. Therefore, we hold that appellees Thompson and Metropolitan failed to establish that there was no genuine issue whether they were entitled to the qualified immunity of § 9.

## MALICIOUS PROSECUTION

To maintain an action for malicious prosecution, a plaintiff must show:

"(a) a criminal proceeding instituted or continued by the defendant against the plaintiff, (b) termination of the proceeding in favor of the accused, (c) absence of probable cause for the proceeding, and (d) 'malice,' or a primary purpose in instituting the proceeding other than that of bringing an offender to justice."

*Brown v. Dart Drug Corp.*, 77 Md.App. 487, 491, 551 A.2d 132 (1989), citing *Exxon Corp. v. Kelly*, 281 Md. 689, 693, 381 A.2d 1146 (1978).

Appellant would have no difficulty establishing the first two elements. We look then to the last two elements, *i.e.*, absence of probable cause and malice, to see whether, viewing the facts in the light most favorable to appellant, a prima facie case could be supported. Probable cause is a "reasonable suspicion supported by circumstances strong enough to warrant an ordinary and cautious person's belief that the accused is guilty." *K–Mart Corp. v. Salmon*, 76 Md.App. 568, 577, 547 A.2d 1069 (1988). There must be a reasonable basis for the belief that the accused has committed the crime of which he is accused; that is, sincere belief is insufficient. *Banks v. Montgomery Ward*, 212 Md. 31, 39, 128 A.2d 600 (1957). In certain circumstances, we have imposed a duty to investigate. Probable cause may be destroyed where a proper investigation would have cleared away suspicious circumstances. *K–Mart*, 76 Md.App. at 579, 547 A.2d 1069. Moreover, once a person undertakes to investigate and supply police with information, he has a duty to furnish police with exculpatory as well as inculpatory information. *Brown*, 77 Md.App. at 493, 551 A.2d 132.

Malice, or a reason other than bringing a criminal offender to justice, is closely related to probable cause because it may be inferred from the lack of probable cause. *Safeway Stores, Inc. v. Barrack*, 210 Md. 168, 175, 122 A.2d 457 (1956). "The presumption of malice resulting from the want of probable cause is only *prima facie* and may be rebutted by the circumstances under which the defendant acted." *Safeway*, 210 Md. 175, 122 A.2d 457.

Stiller and Frank, Bernstein argue that "it is undisputed that Stiller had no technical knowledge of the criminal law and that he relied on the police to determine how to proceed." This is not necessarily undisputed for several reasons—Stiller is an attorney and, while he may not have in-depth knowledge of criminal law, he can be charged with somewhat more sophistication than a nonlawyer. Second, appellant *does* dispute Stiller's assertion that Stiller relied on the police. In *Brown,* we rejected defendant Dart Drug's similar argument to the effect that it was not responsible as a matter of law for a mistaken criminal charge because the police brought the criminal action based on their own independent investigation:

"It is settled law that a civil defendant may not avoid liability for malicious prosecution by relying on the independent judgment of a prosecutor or attorney unless that defendant has made a full disclosure of all material facts relative to the charges being made." (Citations omitted.) *Brown,* 77 Md.App. at 493, 551 A.2d 132.

Appellant, in deposition, stated that he overheard much of what Officer Foster said to Stiller on the telephone. Appellant allegedly heard Officer Foster ask Stiller, "Do you want to go that route? ... Okay, fine, then we'll go that route." We are thus left with an inference, which must be resolved in appellant's favor for purposes of a motion for summary judgment, that Stiller was, to use the colloquial, calling the shots.

■ In his affidavit, Stiller did not state that he inadvertently or mistakenly gave information that MDIF had legal control of the store to Officer Foster. Rather, Stiller denies that he ever told Officer Foster that Frank, Bernstein (on behalf of MDIF) had seized the premises and had legal control over the store, and that he was told that appellant was a Galleria employee. If a jury were to believe Officer Foster, then appellant could have established lack of probable cause and malice. Officer Foster stated that he would not have arrested appellant in absence of the alleged representations as to control made by Stiller. Stiller said he did not make them. This is obviously a credibility question and is within the province of the jury. Moreover, the focus

when evaluating probable cause is on those facts known to, and genuinely believed by, the one initiating or continuing the prosecution. Exactly *what* a defendant in a malicious prosecution case knew, and when he or she knew it is patently a question for the jury. *See K–Mart*, 76 Md.App. at 577, 547 A.2d 1069. We hold that the trial judge erred in granting summary judgment on appellant's malicious prosecution claim against Stiller and Frank, Bernstein.

■ Turning to appellees Thompson and Metropolitan, a jury could conclude a lack of probable cause and malice if it were to disbelieve Thompson's bribery account, which was significant in appellant's arrest. We hold that the trial judge erred in granting summary judgment on appellant's malicious prosecution count against Thompson and Metropolitan.

## DEFAMATION

Appellees Stiller and Frank, Bernstein argue that the trial judge did not err in granting their summary judgment motion on appellant's defamation count because (1) Stiller made no defamatory statements, (2) but if he did, they were privileged. Appellant maintained that Stiller had told police (and Thompson and Metropolitan) that appellant had broken into the store to steal Galleria business papers which in actuality belonged to MDIF. Appellant also contended that appellees Stiller and Frank, Bernstein defamed him in a letter dated July 17, 1986, stating that appellant had offered Thompson a bribe. Consequently, avers appellant, his reputation was damaged. Appellant's defamation claim against appellees Thompson and Metropolitan centered around Thompson's claim of bribery and his alleged sighting a male figure fitting appellant's description lurking about inside the store after the alleged bribe.

The elements of a prima facie case for defamation are as follows. First, the alleged defamatory statement must expose a person to "public scorn, hatred, contempt or ridicule," and therefore have injured his or her reputation. *Embrey v. Holly*, 48 Md.App. 571, 579, 429 A.2d 251, *cert. granted*, 291 Md. 774 (1981), quoting *Thompson v. Upton*, 218 Md. 433, 437, 146 A.2d 880 (1958). Libel or slander per se is when the defamatory quality of the statement is

plainly apparent from the words themselves.[14] *Embrey,* 48 Md.App. at 579, 429 A.2d 251. Second, "the alleged defamatory publication must be publicized to a third party, and that party must reasonably understand the publication to be defamatory." *Embrey,* 48 Md.App. at 580, 429 A.2d 251. The last element, of course, is proof of damage.

As we recently observed in *Hanlon v. Davis,* 76 Md.App. 339, 341, 545 A.2d 72 (1988), "[t]he modern law of defamation is fraught with perplexities." In the instant case, it is readily apparent that appellant alleged a prima facie case of defamation. The first two elements were met as to appellees Stiller and Frank, Bernstein by Stiller's statements to Officer Foster to the effect that he was concerned that records and expensive merchandise were being removed from the store, as well as by Stiller's letter dated July 17, 1986, which accused appellant of offering Thompson a bribe. As to appellees Thompson and Metropolitan, the first two elements are satisfied by Thompson's statements to Officer Foster and surrounding persons that appellant had attempted to bribe him and was seen lurking about the store.

At first blush, appellant's evidence concerning the last element, *i.e.,* damages, might seem insufficient. Appellant's amended complaint alleges that, as a result of the defamation, he suffered "humiliation" and "loss ... of his personal and professional reputation." Appellant claims compensatory as well as punitive damages. Generally speaking, a pleading alleging libel must show a basis for believing that plaintiff suffered actual injury. *See Wineholt v. Westinghouse Electric Corp.,* 59 Md.App. 443, 449, 476 A.2d 217, *cert. denied,* 301 Md. 354, 483 A.2d 38 (1984). This is required so that the defendant may be put on notice as to the manner, nature and extent of the injury. *Wineholt,* 59 Md.App. at 449, 476 A.2d 217.

We had recent occasion to review the subject of damages for defamation in *Hanlon.* Without covering the same

---

**14.** The libel (or slander) is defamation per quod if the defamatory quality of the words is not readily ascertainable but must be connected to another bit of information for the words to become defamatory. *Embrey,* 48 Md.App. at 579, 429 A.2d 251.

ground that Judge Alpert covered so well and so thoroughly, we briefly state that at common law a defamatory statement per se carried a presumption of damage to a plaintiff's reputation. "Thus, the plaintiff in such a defamation action could recover 'presumed' or 'general' damages for injury to reputation without proof of such injury." *Hanlon,* 76 Md.App. at 351, 545 A.2d 72. The Supreme Court's decision in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), left "unresolved many questions on the issue of damages in defamation cases." *Hanlon,* 76 Md.App. at 352, 545 A.2d 72. Most of these questions were resolved, however, by the Court's opinion in *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985), where the Court made clear that presumed and punitive damages are available to a plaintiff if he proves a knowing falsehood or a reckless disregard for the truth. *Dun & Bradstreet,* 472 U.S. at 766, 105 S.Ct. at 2949. Furthermore, as we stated in *Hanlon,* 76 Md.App. at 355, 545 A.2d 72, "[t]he Supreme Court has not announced a constitutional standard of liability for defamation cases involving private defamation."

In the instant case, unless appellant were held to be a public figure, he could recover presumed and punitive damages *without* a showing of constitutional malice. Even using a public figure analysis, that is, if for some reason appellant were viewed as a public figure for the purposes of this case, there are sufficient facts and corresponding allegations indicating that appellees made the statements either knowing that they were false, or with reckless disregard as to whether they were true or not. We therefore hold that the trial judge erred by granting summary judgment for appellees on the defamation counts.

## FALSE IMPRISONMENT

Did appellant have enough competent evidence of false imprisonment to survive a summary judgment motion? We hold that there was indeed sufficient evidence to make out a prima facie case of false imprisonment. We explain.

In order to prove that he or she was falsely imprisoned, a plaintiff must show that the defendant deprived him or her

of liberty without consent, and without legal justification.[15] *Great, Atlantic & Pacific Tea Co. v. Paul,* 256 Md. 643, 654–58, 261 A.2d 731 (1970); *Safeway Stores, Inc. v. Barrack,* 210 Md. 168, 173–74, 122 A.2d 457 (1955). Although intent is necessary, malice is not—nor is probable cause a defense. Moreover, one who knowingly gives false information to an arresting officer is liable for false imprisonment when that information is a determinative factor in the decision to make the arrest. *K–Mart Corp. v. Salmon,* 76 Md.App. 568, 585, 547 A.2d 1069 (1988). As in *K–Mart,* if any of appellees knowingly gave Officer Foster false information which resulted in a deprivation of appellant's liberty, a prima facie case of false imprisonment can be sustained. We hold that the trial judge erred in granting summary judgment for appellees on the false imprisonment counts.

## ABUSE OF PROCESS

Appellant contends appellees Stiller and Frank, Bernstein intended to use the prosecution as a threat to induce the payment of judgments and to facilitate the execution of the civil process on the assets of the Galleria.

"The tort of abuse of process occurs when a party has wilfully misused criminal or civil process after it has issued an order to obtain a result not contemplated by law." *Krashes v. White,* 275 Md. 549, 555, 341 A.2d 798 (1975); *Allen v. Bethlehem Steel Corp.,* 76 Md.App. 642, 650, 547 A.2d 1105 (1988). The essential elements of the tort are an ulterior purpose and a deliberate act in the use of the process not proper in the regular conduct of the proceeding. "Some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process is required...." *Palmer Ford, Inc. v. Wood,* 298 Md. 484, 511, 471 A.2d 297 (1984) (citation omitted); *K–Mart Corp.,* 76 Md.App. at 588, 547 A.2d 1069.

---

**15.** The absence of legal justification is present when the arresting person does not have authority to make an arrest. *Shipp v. Autoville Ltd.,* 23 Md.App. 555, 568–73, 328 A.2d 349 (1974), *cert. denied,* 274 Md. 725 (1975). Here, appellant was arrested for a misdemeanor, which was not committed in Officer Foster's presence.

 While the evidence is sketchy at best, the fact of the alleged unusual amount of interest of the appellees in pursuing the prosecution of appellant could give rise to an inference of some objective other than the proper administration of justice. It may well be that the fact finder could believe that those objectives were just as appellant suggested. That is, there are facts to support appellant's theory that Stiller and Frank, Bernstein pursued a forbidden collateral objective by and after appellant's arrest. For example, as was pointed out earlier, Richards called a friend at the Attorney General's office to discuss the possibility of having appellant charged with something more serious than a misdemeanor. Stiller was, to some degree, directing Richards' activities. Stiller admittedly met with Gersh, a senior level prosecutor at the circuit court level, in order to discuss the prosecution of appellant. The fact that Richards' notes show that Gersh stated that he could not "figure out any offense" with which to charge appellant could create an inference that Stiller and Frank, Bernstein had requested that appellant be charged with an offense. We therefore hold that the trial court erred in granting summary judgment for appellees Stiller and Frank, Bernstein on appellant's abuse of process claim.[16]

## THE SUBPOENA

An important link in establishing malice is the allegedly unusual amount of activity and interest which appellee Stiller had in prosecuting appellant. Appellant also points to the caliber and experience of personnel in the State's Attorney's office who were interested in the case. Howard Gersh,[17] a senior felony prosecutor at the felony level, *i.e.*, circuit court level, was directed by then State's Attorney Kurt L. Schmoke to investigate the circumstances relating to appellant's arrest. Gersh was instructed to decide what charges, if any, should be filed against appellant.

---

**16.** Appellant did not assert an abuse of process count against appellees Thompson and Metropolitan.

**17.** Gersh is not a party to this suit.

In the course of his investigation, Gersh allegedly spoke to Stiller to obtain information that could be helpful in making a charging decision. The charges filed against appellant were ultimately nolle prossed.

Appellant filed his civil suit in July of 1987. During subsequent discovery, Stiller (in deposition) could not recall what he said to Gersh. Gersh had no present recollection of meeting with Stiller. Therefore, in February of 1988, appellant noted Gersh's deposition. He served a subpoena requesting that Gersh personally appear and bring with him:

"All writings, records and documents in his possession referring or relating to meetings with Shale D. Stiller, Esquire in July and August, 198[6].

"His entire file concerning Harry Laws and Criminal Case No. 0101–109484B4."

Gersh moved to quash the subpoena and for a protective order on the ground that "[a]ny documents contemplated by this subpoena were gathered or obtained by Mr. Gersh in furtherance of a criminal investigation by the Office of the State's Attorney for Baltimore City." In opposing Gersh's motion, appellant asked for the following information:

"(1) the date on which Mr. Stiller met with Mr. Gersh, (2) what Mr. Stiller said to Mr. Gersh, (3) what Mr. Gersh said to Mr. Stiller, (4) how the meeting came to take place and (5) how Mr. Law's [sic] file came within Mr. Gersh's purview."

Appellant also requested access to information relating to the telephone conversation between Gersh and Linda Richards.

In his reply memorandum in support of his motion to quash, Gersh stated that his file contained the following documents:

"1. Memo from Howard Gersh to Thomas R. Kane, Assistant State's Attorney, dated July 31, 1986, concerning disposition of charges.

2. Memo from Howard Gersh to Alexander Palenscar, Deputy State's Attorney, dated July 30, 1986, summarizing his investigation, analyzing the evidence, and recommending disposition.

3. Memo from Detective Meacham, a Baltimore City Police officer assigned to the Office of the State's Attorney, to Kurt L. Schmoke, as State's Attorney for Baltimore City, dated July 22, 1986, concerning interview of Harry Laws.

4. Memo from Shale D. Stiller to file dated July 17, 1986, concerning events of July 16, 1986.

5. Police Report dated July 16, 1986 prepared by Officer Foster, of the Baltimore City Police Department.

6. Howard Gersh's notes from July 22, 1986 through August 5, 1986 summarizing his conversations with other members of the Office of the State's Attorney, police officers, and members of the Office of the Attorney General, Shale Stiller, Esquire, and others."

The memo from Stiller to the file dated July 17, 1986, concerning events of July 16, 1986, 4 above, and the police report, 5 above, were made available to appellant. Gersh claimed however, that the balance of this information, *i.e.*, 1, 2, 3 and 6 above, were protected by executive privilege and the work product privilege.[18]

In May, 1988, a hearing was held at which the motion was argued. The trial judge granted Gersh's motion to quash based on executive privilege; the judge made no explicit finding in regard to whether the material requested was attorney work-product.

Before turning to an analysis of privilege in the instant case, we briefly note the scope of review of discovery decisions. Generally, "[a] party may obtain discovery regarding any matter, *not privileged ....*" Rule 2–402(a) (emphasis added). The Maryland discovery rules were deliberately designed to be broad and comprehensive; their purpose is to assure that no party go to trial in a confused or muddled state of mind regarding the facts giving rise to the litigation. *Rubin v. Weissman*, 59 Md.App. 392, 400, 475 A.2d 1235 (1984).

---

**18.** Gersh claimed the privilege on his own behalf, as well as for the Office of the State's Attorney for Baltimore City. The Office of the Attorney General represented Gersh and the State's Attorney's office at the summary judgment hearing, as well as on this appeal.

Appellant argues that he was entitled to any notes of Gersh's pertaining to Stiller, as well as the other items in Gersh's file, not only because of necessity, but because there *are* allegations of misconduct involving the State's Attorney's Office. The Stiller/Gersh meeting and the State's Attorney's investigative process are therefore operative facts in this case.

Appellant also urges that there are strong public policy reasons against applying executive privilege in this particular case. Specifically, appellant contends that the fact that members of Stiller's firm contributed to Schmoke's mayoral campaign suggests that Stiller may have access and influence on the State's Attorney's office beyond that of ordinary citizens. Invoking executive privilege, argues appellant, suggests an effort by the well-connected to suppress evidence from those who are not, and permits Stiller an unfair advantage in light of the fact that Stiller claims not to recall what he said to Gersh.

At the onset, we point out that we are not convinced that executive privilege, as it has been traditionally interpreted and defined, covers the situation at hand. Executive privilege is sometimes referred to as the privilege for "governmental secrets." *McCormick on Evidence,* § 106–113 (3d ed. 1984). *See also Hamilton v. Verdow,* 287 Md. 544, 553, n. 3, 414 A.2d 914 (1980). The "governmental secrets" privilege, *i.e.,* executive privilege, encompasses several different situations. We set them out in order to provide a background for subsequent analysis.

First, there is the classic sort of executive privilege which is applied to military or diplomatic secrets. *See, e.g., Totten v. United States,* 92 U.S. 105, 23 L.Ed. 605 (1875) (action by former spy, after the Civil War, for his services during war under contract with President; held, action denied since it would endanger secrecy of such arrangements); *Firth Sterling Steel Co. v. Bethlehem Steel Co.,* 199 F. 353 (E.D.Pa. 1912) (drawings of Navy weapons excluded by Court recognizing rule of public policy forbidding disclosure of military secrets). The rationale behind the military/diplomatic secrets privilege is the concern that disclosure would be

deleterious to national defense or international relations. We are obviously not faced with such a situation in the instant case.

The second type of executive privilege is the one established in *United States v. Nixon*, 418 U.S. 683, 705–06, 94 S.Ct. 3090, 3106–3107, 41 L.Ed.2d 1039 (1974), recognizing a constitutional privilege protecting confidential communications between the President and his or her advisors. The so-called constitutional presidential privilege is not absolute, however, and is subordinate to the demonstrable need for relevant evidence in a criminal proceeding. *Nixon*, 418 U.S. at 713, 94 S.Ct. at 3110. The rationale behind this privilege is the protection of the deliberative and mental processes of the decision-makers; the Court said:

"Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *Nixon*, 418 U.S. at 705, 94 S.Ct. at 3106.

Another type of executive privilege is sometimes extended to law enforcement investigative files. These files are protected because disclosure might compromise the identity of confidential sources, or reveal the exact nature of the prosecution's case, thus making the task of a criminal defendant in preparing an effective defense much easier. Another rationale for such a privilege is to "prevent the casting of unnecessary suspicion upon persons ultimately exonerated by the investigative process." *McCormick, supra*, at 267. This privilege expires when the specific investigation or governmental undertaking ends, *see Frankenhauser v. Rizzo*, 59 F.R.D. 339 (E.D.Pa.1973), and will not attach at all unless the government makes an initial demonstration that "some specific detriment of the types sought to be avoided will ensue from disclosure of the matter sought to be protected." *McCormick, supra*, at 267. We are aware of no Maryland case which applies an executive privilege such as this to notes and documents in a State's Attorney's file. Indeed, aside from the privilege against self-incrimination, Maryland has no general rule making reports or returns required by law privileged. *See Andre-*

*sen v. Bar Association of Montgomery County,* 269 Md. 313, 322–330, 305 A.2d 845, *cert. denied,* 414 U.S. 1065, 94 S.Ct. 572, 38 L.Ed.2d 470 (1973).[19]

In *Hamilton v. Verdow,* 287 Md. 544, 414 A.2d 914 (1980), the Court of Appeals held, pursuant to a certified question from the United States District Court, that the doctrine of executive privilege is recognized in Maryland for intra-governmental advisory and deliberative communications. *Hamilton,* 287 Md. at 562, 414 A.2d 914. The material in *Hamilton* which the government sought to protect by the invocation of executive privilege was a confidential report concerning the handling of a particular mental patient[20] at Spring Grove Hospital. The report was prepared for and at the request of the Governor by a member of the Governor's staff, and referred to as the Wilner Report.[21] *Hamilton,* 287 Md. at 547, 414 A.2d 914. The Court in *Hamilton* grounded its recognition of an executive privilege on the fact that "[o]ur cases have recognized ... that the Governor bears the same relation to this State as does the President to the United States, and that generally the Governor is entitled to the same privileges and exemptions in the discharge of his duties as is the President." *Hamilton,* 287 Md. at 556, 414 A.2d 914. The Court in *Hamilton* also recognized that the constitutional principle of separation of powers limited the judiciary's reach into "the conclusions, acts, or decisions of a coordinate branch of government made within its own sphere of authority." *Hamilton,* 287 Md. at 556, 414 A.2d 914.

---

**19.** There are, however, particular statutes addressing certain types of records. For example, information contained in State tax returns may be disclosed only pursuant to exceptions contained in Md.Tax–Gen.Code Ann. § 13–203 (1988).

**20.** The patient went to visit his parents in Florida; while there, he killed a young boy. The personal representative of the Florida victim brought the diversity action against the Superintendent of Spring Grove and two staff psychiatrists. *Hamilton,* 287 Md. at 244, 414 A.2d 914.

**21.** The Wilner Report was prepared by Judge Alan Wilner when he served on the Governor's staff. ·

The Court ultimately held that an *in camera* inspection of the report was required. *Hamilton,* 287 Md. at 569, 414 A.2d 914. That way, the federal trial court could sever the truly privileged material if feasible, *i.e.,* separate the executive and legislative opinions contained therein from any purely factual material. *Hamilton,* 287 Md. at 544, 568, 414 A.2d 914.

What was *not* explicitly established in *Hamilton,* however, was that the doctrine of executive privilege should routinely be extended to a particular State's Attorney's investigation or a State's Attorney's office, particularly in a situation such as this where the internal workings of that office are an issue. Indeed, the Court observed in *Hamilton,* 287 Md. at 563–64, 414 A.2d 914, that, even where the material is privileged, the executive privilege claim may be rejected because the litigant's need for disclosure outweighs any interest the government may have in confidentiality, *i.e.,* where there are allegations of government misconduct.[22] The Stiller/Gersh meeting and the State's Attorney's investigative process are operative facts in the instant case. That appellant has a legitimate need for existing evidence, *i.e.,* that he is not engaged in a "fishing expedition," is reflected by the fact that Gersh's file does contain items that may include evidence to help support his claims. Part of appellant's allegations include governmental misconduct, *i.e.,* that the State's Attorney's office was particularly responsive to Stiller and his law firm, and that it was unusual for a senior felony attorney such as Gersh to be so concerned with a misdemeanor. Additionally, what Stiller stated to Gersh involves factual data important to appellant's case. It is factual evidence which is unavailable from other sources, considering that neither Gersh nor Stiller recall the substance of their meeting. Gersh's nolle pros of the criminal charge against appellant suggests at least the possibility of lack of probable cause, an element necessary to maintain appellant's malicious prosecution charge. Ap-

---

**22.** Other situations where the litigant's need may outweigh the government's interest is where the privilege is asserted for potential evidence at a criminal trial, *see Nixon,* 418 U.S. at 711–13, 94 S.Ct. at 3109–3110, or where the government itself is a party. *See Smith v. Schlesinger,* 513 F.2d 462, 468 (D.C.Cir.1975).

pellant must, to survive a directed verdict, present evidence as to *why* the charge was dropped. There appears to be evidence in Gersh's possession showing that he dropped the charge because appellant had a right to be on the premises. Rule 4–247(a) requires that "[a] statement of the reasons for entering a nolle prosequi shall be made a part of the record." Certainly, it is appellant's responsibility to look first to this source. If the State's reason for the nolle pros is not detailed enough, or if there are grounds to believe that the complete reason was *not* put on the record, appellant will need Gersh's notes.

■ We hold that the information sought by appellant is discoverable. We point out that our holding is based upon the facts peculiar to this case—we have no need and do not reach a situation where there are no allegations of government misconduct. We agree with appellant to the extent that to establish an executive privilege protecting the information sought upon the mere assertion by the State that the materials are privileged could create the appearance of a "cover-up." All privileges are to be strictly construed because they exclude what otherwise may be relevant and reliable evidence. *Ellison v. State*, 65 Md.App. 321, 324–27, 500 A.2d 650 (1985).

Our holding also is supported by *Riggins v. Maryland*, 125 Md. 165, 170 (1915), where the Court held that not all statements made by a prosecution witness to a prosecuting attorney are privileged:

"In other jurisdictions, in cases of malicious prosecutions and false arrests, the prosecuting attorney has been permitted, under objection, to state in evidence what had been communicated to him by the defendant, as prosecuting witness, in the investigation or prosecution of a preceding criminal charge, where such communication formed the basis of the civil suit." (Citations omitted.)

In his brief, appellee Gersh argues that his notes were protected by the work-product rule. Although Gersh did not raise this argument at the hearing, nor was the work-product rule specifically mentioned in Gersh's motion to quash, he did make reference to it in his supporting memorandum. Since the trial judge did not reach the question,

we will not reach the issue of whether the work-product rule would apply to Gersh's notes. Rule 8–131. This is an issue the trial court may wish to consider on remand.[23]

REVERSED AND REMANDED FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION. COSTS TO BE PAID BY APPELLEES.

FISCHER, J., concurring:

I concur in the holding of the majority that summary judgment in favor of the appellees was inappropriate. In view of the conflicting recollections of the police officer (Foster) and Stiller, it is clear that a factual dispute exists as to the circumstances of appellant's arrest. Officer Foster testified that Stiller told him that MDIF had control of the store on July 16, 1986 and that Foster would not have arrested Laws had Foster known that MDIF did not have control of the store. Stiller denies telling the officer that MDIF controlled the store. From this conflicting testimo-

---

**23.** If the question of work product is raised on remand, we remind the trial court that the method of proceeding when the issue is raised was clearly delineated in *Kelch v. Mass Transit Administration,* 287 Md. 223, 411 A.2d 449 (1980). The first question is whether the adversary has in its possession or under its control the item or items sought. Then

"(a) [i]n the event the motion respondent answers that it has no knowledge as to the existence of such demanded item, or that, while it knows of the item's existence, it is neither within its possession nor control, the burden is on the demanding party to factually show to the contrary by a preponderance of the evidence;

(b) if the responding party, however, while acknowledging either possession or control of the demanded item, says it is not discoverable by virtue of Rule 400 d's exception provision that the item was 'prepared in anticipation of litigation or for trial' (or for any other proper reason), the burden is upon the responding party to substantiate its non-discovery assertion by a preponderance of the evidence; and

(c) if, on the other hand, the demanding party, while recognizing that the requested item was 'prepared in anticipation of litigation or for trial' by his adversary, claims discovery under the exception authorized in Rule 400 d (i)(ii) and (iii) the burden of so establishing by a preponderance of the evidence rests on the exception claimant."

*Kelch,* 287 Md. at 229, 411 A.2d 449. Rule 2–402 makes no change from Md.Rule 400 d as it relates to work product.

ny, a jury could make certain findings and draw appropriate inferences. They could find that the officer's recollection is incorrect which would absolve Stiller. They could find that Stiller's version is erroneous. The latter conclusion could lead the jury to infer that Stiller negligently told the officer he had control of the store when he did not. In the alternative, the jury might also infer that Stiller deliberately told the officer he had control of the store knowing he did not, with the purpose of causing Laws' arrest. It is because of this last possible inference that I concur in the majority decision.

Ironically, had Stiller's recollection of the events been the same as that of Officer Foster, and had Laws' arrest resulted because Stiller was in error as to his control of the store, in my opinion, Stiller would be protected by his qualified immunity.

I do not share the majority's view with respect to Stiller's "pursuit of the appellant's prosecution." We know nothing of the content of Stiller's conversation with Gersh, and Linda Richards' efforts, according to her testimony, were not directed at appellant. I am not persuaded that the placement of Richards' memo in a particular file is sufficient to put at issue her unequivocal testimony. To that end, the admissibility of Stiller's opinion regarding the import of the placement of the memo in a particular file is highly questionable.

Further, I do not concur that it "was not MDIF's mission to prosecute criminally employees of Galleria." It seems apparent that Stiller had a duty to take all reasonable steps to preserve assets over which MDIF had taken control. A proper aspect of those efforts could entail the bringing of criminal charges when necessary.

Finally, I do not believe that there are facts to support an inference that Stiller and Frank, Bernstein brought about the arrest of Laws in order to collect judgments. There is no evidence to suggest that Stiller made any attempt to use Laws' situation as a collection lever. That charge seems to me to be a bald allegation without any evidentiary support.